Michael W. Ellison, Esq. (SBN 145832)
mellison@sehlaw.com
SMITH ♦ ELLISON
A Professional Corporation
2151 Michelson Drive
Suite 185
Irvine, California 92612
Telephone:(949) 442-1500
Facsimile: (949) 442-1515

Jared L. Cherry (Pro Hac Vice Application Forthcoming)
jared@pcfblaw.com
PCFB, LLC
4001 South 700 East, Suite 500
Salt Lake City, Utah 84107
Telephone:  (801) 935-4932
Facsimile:  (801) 935-4936

Attorneys for Nexon America Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| WOLFIRE GAMES, LLC, SEAN COLVIN, SUSANN DAVIS, DANIEL ESCOBAR, WILLIAM HERBERT, RYAN LALLY, HOPE MARCHIONDA, EVERETT STEPHENS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>VALVE CORPORATION,<br><br>        Defendant | Case No.<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO QUASH SUBPOENA TO NON-PARTY NEXON AMERICA INC.** |

motion to quash.mem.docx

# <u>TABLE OF CONTENTS</u>

**CONTENTS**

I.     SUMMARY OF ARGUMENT ..................................................................1

II.    BACKGROUND ......................................................................................2

     a.    Nexon Objects to the Subpoena and Counsel for the Parties Meet and Confer...........................................................5

     b.    The Relationship Between Nexon Japan, Nexon Korea, and Nexon America............................................6

III.   LEGAL STANDARD .............................................................................7

IV.   ARGUMENT .........................................................................................8

     a.    The Subpoena Imposes an Undue Burden on Nexon ............................9

          i.    The Subpoena is Geographically Overbroad and Purports to Require Compliance by Foreign Entities and Production of Documents Outside of Nexon America's Control. ...........................9

          ii.   The Subpoena is Temporally Overbroad....................11

          iii.  The Documents Sought are Either Irrelevant or Disproportionate to the Importance of the Discovery and Valve's Need for the Information. ..........................................................14

     b.    The Subpoena Seeks to Compel Highly Confidential Information Regarding Nexon's Profit Margins, Customers, and Business Strategies........................................22

     c.    Nexon is Entitled to Recover its Costs and Fees Incurred in Bringing this Motion. .......................................25

V.    CONCLUSION ...................................................................................27

1

# TABLE OF AUTHORITIES

2

3 **Cases**

4 *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463 (N.D.
5 Cal. 2020) .................................................................................................19

6 *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*,
300 F.R.D. 406 (C.D. Cal. 2014) ..............................................................7

7 *Casun Ivest, A.G., v. Ponder*, 2019 U.S. Dist. LEXIS 93971 (D.
Nev., Jun 4, 2019) ....................................................................................23

8
*Convolve, Inc. v. Dell, Inc.*, No. C 10-80071 WHA, 2011 U.S.
9 Dist. LEXIS 53641, at *7 (N. D. Cal. May 9, 2011) ...............................20

10 *Gonzales v. Google*, 234 F.R.D. 674, 684 (N. D. Cal. 2006).....................19

11 *Gutierrez v. Mora*, 2019 U.S. Dist. LEXIS 231465, Case 18-781-
KS (C.D. Cal. 2019, Dec. 18, 2019)........................................................13
12
*In re Application of Pioneer Corporation*, 2018 WL 2146412,
13 Case. No. MC 18-0037 (C.D. Cal., May 9, 2018) ...................................11

14 *In re Citric Acid Litigation*, 191 F.3d 1090 (9th Cir. 1989)...................1, 9

15 *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 180 F. Supp.
3d 273 (S.D.N.Y 2016) .............................................................................13
16
*In re Subpoena of DJO, LLC*, 295 F.R.D. 494 (S.D. Cal. 2014)...............7
17
*Legal Voice v. Stormans Inc.*, 738 F.3d 1178 (9th Cir. 2013)..................22
18
*Lemberg Law LLC v. Hussin*, No. 16-mc-80066-JCS, 2016 WL
19 3231300 (N.D. Cal. June 13, 2016) ...........................................................6

20 *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir.
2003).........................................................................................................12
21
*Moon v. SCP Pool Corp.*, 232 F.R.D. 633 (C.D. Cal. 2005)....................7
22
*Mount Hope Church v. Bash Back!*, 705 F.3d 418, 426 (9th Cir.
23 2012)........................................................................................................22

24 *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575 (N.D. Cal.
2007)........................................................................................................14
25
*PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1176
26 (W.D. Wash. 2021)..................................................................................10

27 *Seifi v. Mercedes-Benz U.S.A., LLC,* Case No. 12-cv-05493,
2014 WL 7187111 (N.D. Cal. Dec. 16, 2014) ..........................................8
28

*United States v. C.B.S., Inc.*, 666 F.2d 364 (9th Cir. 1982) ........................................... 6

**Statutes**

15 U.S.C. § 1 ............................................................................................................... 2

15 U.S.C. § 15b ....................................................................................................... 1, 10

RCW § 19.86.010 ........................................................................................................ 2

**Rules**

Fed. R. Civ. 26 ......................................................................................................... 13

Fed. R. Civ. P. 45 ............................................................................................... 1, 6, 19

Fed. R. Civ. P. 6 ......................................................................................................... 3

Fed. R. Evid. 401 ....................................................................................................... 13

**Treatises**

MILGRIM ON TRADE SECRETS § 1.01 (2022) ........................................................... 19

MOORE'S FEDERAL PRACTICE, § 34.14 ................................................................. 9

Memorandum Of Points And Authorities In Support Of
Motion To Quash Subpoena By Non-Party Nexon

## I.      SUMMARY OF ARGUMENT

The subpoena (the "Subpoena") served by Valve Corporation ("Valve") demands production information in 27 separate categories (several of which include numerous subparts), demands that such information be produced for a period covering more than 20 years, and demands production of documents from each of Nexon America Inc.'s ("Nexon America") affiliated entities throughout the world. The temporal scope of the subpoena is manifestly unreasonable because the underlying cause of action is subject to a 4-year statute of limitations.  15 U.S.C. § 15b.  Moreover, the world-wide scope of the subpoena is also manifestly unreasonable because Valve has failed to even allege—much less prove—that Nexon America has "control"[1] over the documents it seeks from Nexon America's affiliates throughout the world.

Valve has failed to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Valve's demand that Nexon undertake a worldwide search for documents dating back more than two decades and divulge in exhaustive highly-

---

[1] In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F.3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)). The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77).

motion to quash.mem.docx

sensitive commercial information related to Nexon America's business strategies violates Fed. R. Civ. P. 45(d)(1) and the Court should quash the Subpoena.  The Court should also award Nexon America its reasonably incurred costs and fees incurred in bringing this motion.

## II.        <u>BACKGROUND</u>

Nexon America is part of the Nexon Group, which is a pioneer in the world of interactive entertainment software.  Since its founding in 1994, the Nexon Group has introduced some of the most significant innovations in the industry, including the world's first graphic massively multiplayer online role-playing game (MMORPG) and the first free-to-play game.  The Nexon Group is an industry leader in MMORPGs, with more than 80 live games operated across more than 190 countries.  The Nexon Group entities employ more than 7,000 people and conduct business in five distinct business units throughout the world.

The present dispute relates to allegations of anti-competitive conduct by Valve related to the Steam video game distribution service ("Steam").  *See e.g.*, Second Amended Complaint, at ¶ 3, Doc. 68, Case 2:21-cv-563-JCC (W.D. Wash, Dec. 20, 2021) (the "Second Amended Complaint") ("Valve has been able to keep its commission fees at supracompetitive levels for years by actively suppressing competition to protect its market dominance").  The second amended complaint recites seven counts related to alleged violations of the Sherman Act, 15 U.S.C. § 1

Memorandum Of Points And Authorities In Support
Of Motion To Quash Subpoena By Non-Party Nexon

*et seq.*, and one count related to the Washington State Consumer Protection Act,

RCW § 19.86.010, *et seq*.

The Plaintiffs' Second Amended Complaint includes the following allegation,

which Valve admits, regarding the Steam platform.

71. . . . The Steam Gaming Platform grew from offering seven games in 2004
to over 45,000 by 2021.
…
113. According to Valve:

While Steam was already seeing significant growth in 2020 before
COVID-19 lockdowns, video game playtime surged when people started
staying home, dramatically increasing the number of customers buying
and playing games . . . . This has led to new highs for monthly active
users (120.4 million), daily active users (62.6 million), peak concurrent
users (24.8 million), first-time purchasers (2.6 million per month), hours
of playtime (31.3 billion hours), and the number of games purchased
(21.4% increase over 2019).

Second Amended Complaint at ¶¶ 71, 113 (footnotes omitted); Answer to Second

Amended Complaint, at ¶¶ 71, 113, Doc. 85, Case 2:21-cv-563-JCC (W.D. Wash,

June 10, 2022) ("71. Valve admits all allegations in paragraph 71 and footnotes 15,

16, and 17…113. Valve admits that the quoted words appear in the cited website

post, and respectfully refers the Court to the post for a complete statement of its

contents. Valve admits the facts asserted in the quotation").

Valve served the Subpoena on non-party Nexon America Inc. on January 23,

2023.  A copy of the subpoena is attached hereto as Exhibit A.  The Subpoena

commands the production of documents by February 20, 2023, which is Presidents'

Day, and as such, the deadline is extended to February 21, 2023, pursuant to Fed. R. Civ. P. 6(a)(1)(c).

Like thousands of other video game creators, Nexon distributes video games on the Steam platform. Although Valve's rationale for sending the Subpoena to Nexon America is not clear, a cover letter accompanying the subpoena is addressed generically "Dear Steam Partner." Exhibit A. This salutation suggests that substantially similar subpoenas were sent to other video game companies that offer games on Steam.

The Subpoena, which runs for 24 pages, demands production of 27 distinct categories of documents dating back to January 2003 (i.e., more than 20 years). The subpoena further commands the production of documents by both Nexon America and every entity related to Nexon America according to following definition:

> Nexon America Inc. and each of its agents, representatives, employees, contractors, and any other person, predecessors, parent companies, subsidiaries, acquired companies, and businesses, partnerships, affiliates, and entities, of whatever kind, in which any of them has a business interest or which is subject to your control, including without limitation Nexon Co. Ltd., Nexon Corporation, NX Games Inc., and Nexon US Holding Inc.

Exhibit A, Instructions and Definitions at ¶ 6, Request. No. 1. One notable feature of the definition is the inclusion of Nexon Co. Ltd., a Japanese corporation, and Nexon Corporation, a Korean corporation. The Subpoena demands production of documents in three broad categories, namely: (1) exhaustive detail related to Nexon's revenue, sales, customers, profits, business decisions, and strategies

(Request Nos. 1-11, 17); (2) Nexon's assessment of competition in the industry in general, and with respect to Valve in particular (Request Nos. 12-16, 18-25); and (3) documents related to the underlying litigation (Request Nos. 26-27).

        a.    **<u>Nexon Objects to the Subpoena and Counsel for the Parties Meet and Confer</u>**

Nexon America served its objections to the Subpoena February 6, 2023.  A copy of Nexon America's Objections are attached as Exhibit B.  Among other things, Nexon America objected to the Subpoena on the grounds that the requests are excessive in scope, both geographically and temporally, demand production of documents that are outside of Nexon America's "control," and seeks to compel production of highly-confidential information.

In a letter dated February 6, 2023, and that accompanied Nexon's objections, Nexon requested that counsel for Valve agree to withdraw the Subpoena.  A copy of the letter is attached hereto as Exhibit C.  In response, counsel for Valve requested, and counsel for Nexon America agreed to meet and confer regarding the Subpoena and Nexon America's objections.

Counsel for Nexon America and counsel for Valve held two video conferences to discuss the Subpoena.  During the first conference on February 8, 2023, counsel for Valve communicated it would not withdraw the subpoena and that it would oppose any motion filed by Nexon America to quash the subpoena.  Counsel for Valve further asserted that Nexon must respond by identifying the

Memorandum Of Points And Authorities In Support
Of Motion To Quash Subpoena By Non-Party Nexon

documents that Nexon would agree to produce in response pursuant to the Local Rules of this Court.

No agreement was reached during the discussion on February 8, 2023, but counsel for Nexon and counsel for Valve scheduled a second discussion on February 13, 2023.  At the conclusion of the second conference, counsel for Valve agreed to confer with Valve about potentially narrowing or withdrawing certain requests and to contact counsel for Nexon after such discussions.  As of the filing of this motion, counsel for Valve has *not* contacted counsel for Nexon America about narrowing or withdrawing any requests.

**b.    The Relationship Between Nexon Japan, Nexon Korea, and Nexon America**

Among other things, Nexon America objected to the Subpoena's definitions, which purportedly extend to Nexon America's foreign affiliates, including Nexon Japan and Nexon Korea.  Nexon Japan is the parent company of a broader corporate group, the "Nexon Group." Nexon Japan is a listed company on the Tokyo Stock Exchange, and it publishes an annual report for its investors.  A copy of the most recent annual report is attached as Exhibit D.

The Nexon Group consists of 41 subsidiaries, together with 15 affiliated companies and joint ventures throughout the world.  Exhibit D. at 8.  Nexon Japan functions separately and independently from the other Nexon Group entities because Nexon Japan is "responsible for developing the overall strategies" and the Nexon

Group's subsidiaries do so "subsidiaries do so in their respective regions as independently managed entities."  (Ex. D at 8). As "independently managed entities," Nexon's various subsidiaries maintain an arms-length relationship with the other Nexon Group entities, including Nexon Japan. As "independently managed entities" Nexon's subsidiaries maintain separate finances, assets, officers, and records.  Nexon Japan's annual report reflects the separate financial records of each "reportable segment."  Nexon operates with five distinct "reportable segments," namely: Japan, Korea, China, North America, and Other (which primarily includes European and Asian Countries).  Nexon America has no legal right to demand that other entities in the Nexon Group produce documents in response to the Subpoena.

## III.     <u>LEGAL STANDARD</u>

For purposes of discovery, a party may subpoena information from a nonparty to litigation, but Federal Rule of Civil Procedure 45 protects the subpoena recipient by requiring the issuer to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" and by setting out several mandatory and discretionary grounds for quashing a subpoena. *See* Fed. R. Civ. P. 45(d)(1), (3). Rule 45 provides that a court *must* quash or modify a subpoena that "subjects a person to undue burden."  Fed. R. Civ. P. 45(c)(3)(A)(iv). Additionally, the issuing court *may* quash or modify a subpoena if it requires: "disclosing a trade secret or other confidential research, development, or commercial information."  Fed. R. Civ. P. 45(c)(3)(B)(i).

"The Ninth Circuit has long held that nonparties subject to discovery requests deserve extra protection from the courts." *Lemberg Law LLC v. Hussin*, No. 16-mc-80066-JCS, 2016 WL 3231300, at *5 (N.D. Cal. June 13, 2016) (citing *United States v. C.B.S., Inc*., 666 F.2d 364 (9th Cir. 1982)).  "In determining whether a subpoena poses an undue burden, courts weigh the burden to the subpoenaed party against the value of the information to the serving party. Generally, this requires consideration of relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed."  *In re Subpoena of DJO, LLC*, 295 F.R.D. 494, 497 (S.D. Cal. 2014) (internal citations and quotations omitted). *See also Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005).  "[O]ther factors a court should consider include the relevance of the requested information and the breadth or specificity of the discovery request." *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 409-10 (C.D. Cal. 2014).

## IV.     **ARGUMENT**

The crux of the dispute between Valve and the plaintiffs is whether Valve engaged in anticompetitive conduct by suppressing competition in the video game industry in violation of the Sherman Act and the Washington State Consumer Protection Act.  In response to the plaintiffs' allegations, Valve has embarked on a fishing expedition and seeks to compel Nexon America to scour the globe for any document created in the past 20 years—without regard for the relevance of such

Memorandum Of Points And Authorities In Support
Of Motion To Quash Subpoena By Non-Party Nexon

documents, the burden that such a search would impose on Nexon, the proportionality of Valve's need for such information to the costs of compliance, or the competitively sensitive nature of such information—to support Valve's defenses. Valve has thrown out the broadest possible net in the hopes of finding evidence to support its position.   Rule 45(d)(1) precludes this strategy.

Nexon is merely one of hundreds or thousands of video game creators that distribute games and has no unique information related to the underlying dispute. As such, even setting aside the excessive temporal and geographic scope of the Subpoena, the exhaustive detail Valve seeks is irrelevant, or at least disproportional to any need in the underlying litigation.  To the extent that Valve follows through with its claim that it will oppose the present motion, Valve should explain:(1) why none of Nexon's objections to the Subpoena are valid; (2) whether Valve contends that Nexon has unique information related to the underlying litigation, and if so, how Nexon America's position differs from the thousands of other creators of video games offered on the Steam Platform, at least some of whom have likely been similarly served with a nearly identical subpoena; (3) whether Valve reserves its right to argue that the documents sought by the Subpoena are irrelevant or should be excluded for any other reason if they contradict Valve's position.

### a.   The Subpoena Imposes an Undue Burden on Nexon

#### i.   The Subpoena is Geographically Overbroad and Purports to Require Compliance by Foreign Entities and Production of Documents Outside of Nexon America's Control.

1  A party seeking production of documents from a foreign parent or affiliate

2  company of a U.S. subsidiary must establish that the U.S. subsidiary has "control"

3  over the requested documents. *Seifi v. Mercedes-Benz U.S.A., LLC,* Case No. 12-cv-

4  05493, 2014 WL 7187111, at *2-3 (N.D. Cal. Dec. 16, 2014) (denying motion to

5  compel Mercedes-Benz USA to produce documents located in Germany and

6  controlled by Daimler AG). In the Ninth Circuit, "[c]ontrol is defined as the legal

7  right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F.3d

8  1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of*

9  *Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)). The burden of

10  establishing control over the documents sought rests on the party seeking

11  production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir.

12  1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at

13  34-77).

14  The Subpoena commands the production of documents from Nexon Japan and

15  Nexon Korea, which are located in Japan and Korea, respectively, together with at

16  least 50 other entities disbursed throughout the world.  As set forth above, Nexon

17  Japan and Nexon Korea operate at arm's length from Nexon America, and Nexon

18  America has no "legal right to obtain documents upon demand" from Nexon Japan,

19  Nexon Korea, or the other 50 entities that are a part of the Nexon Group and that are

20  sought by the Subpoena.

motion to quash.mem.docx

10

Valve has offered no evidence showing that Nexon America (*i.e.*, the entity upon which the subpoena was served) has "control" over the documents of Nexon Japan or Nexon Korea.  As such, Valve has failed to carry its burden on this issue. When counsel for the parties discussed this particular issue, the only argument offered by Valve was that obtaining discovery from foreign companies is expensive, and as such, Nexon America, Nexon Japan, and Nexon Korea should simply agree to produce the documents.  Such arguments cannot satisfy Valve's burden of showing that Nexon America has "control" over the documents sought by the Subpoena.

Even assuming that Nexon America could obtain the documents from Nexon Japan, Nexon Korea, and every other affiliated entity throughout the world (it cannot), such a request is an undue burden.  The complaint makes no allegation whatsoever about Valve's conduct in Japan, Korea, or any other country where Nexon has an affiliated entity.  As such, the exhaustive records demanded from Nexon Japan, Nexon Korea, and every other Nexon entity throughout the world are irrelevant to the claims or defenses at issue in the litigation.

### ii.　　　The Subpoena is Temporally Overbroad

The Subpoena commands the production of documents from the period January 1, 2003 through the present (*i.e.*, a period of more than 20 years).  Request Nos. 1-4 and 11-17 each explicitly command the production of documents dating from "January 1, 2003 to the present."  The other requests do *not* include an explicit

time period; however, the Instructions and Definitions served by Valve provide:

"[u]nless otherwise specified, the period during which documents that are to be

produced in response to these Document Requests were created is January 1, 2003

to the present."  Exhibit A.

The demand for 20 years of records contrasts with the 4-year statute of

limitations imposed by the Sherman Act and the Washington State Consumer

Protection Act.[2]  Even if documents establishing Nexon's sales within the

applicable statute of limitations are relevant to whether Valve engaged in anti-

competitive conduct (they are not), there is no argument that documents dating back

20 years are relevant according to the Second Amended Complaint, which alleges:

> **_55. In 2003, Valve launched the Steam Gaming Platform which, at the time,
> centered primarily on providing a patch and update process for Valve-
> developed games_**.  Patches fix flaws, or "bugs," in a game's software after
> initial release, while updates often incorporate new functionality or content into
> the game.  Prior to introducing the Steam Gaming Platform, Valve had
> difficulty with providing patches and updates for its games, which created
> problems for Valve because its games often involved an online multiplayer
> component that required the various copies of games that users owned to
> interact with each other.  Because users often obtained different versions of the
> games (e.g., v1, v1.1, v1.2, etc.), they could have compatibility problems
> which would prevent them from playing together.  The Steam Gaming

---

[2] *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F. 3d 1055, 1059-1060 (9th Cir. 2012) ("Antitrust actions must be commenced within four years from the date when the causes of action accrue. 15 U.S.C. § 15b. We do not require a plaintiff to actually discover its antitrust claims before the statute of limitations begins to run"); *PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158 (W.D. Wash. 2021) ("Private federal antitrust actions are subject to a four-year statute of limitations from the date the cause of action accrues under 15 U.S.C. § 15b. The limitations period for antitrust violations under the Washington Consumer Protection Act ('WCPA') is likewise four years, RCW 19.86.120, and Washington courts look to federal law when interpreting these antitrust provisions of the WCPA").

Platform provided a central location for Valve customers to receive those software updates and keep their games up to date.

**_56. There was no store component to Steam at launch, and Steam was functionally only a PC Desktop Gaming Platform_**.  Thus, computer gamers would purchase their computer games from other distributors like GameStop or BestBuy and then add purchased games to the Steam Gaming Platform on their PC. Distribution and Gaming Platform were thus completely separate processes and products.

Second Amended Complaint at ¶¶ 55-56.  In response, Valve asserts:  "55…Valve admits only that it launched Steam in 2003 and that Steam helped users keep their games up to date.  56… Valve admits that consumers purchased games from other distributors rather than on Steam when Steam launched."  Given that "there was no store component to Steam" in 2003, Valve's demand for sales records from this period is entirely without justification.

In similar contexts, periods of time less than 20 years have been found to be unduly burdensome, particularly where the records sought extend outside of the period of time pertinent to the case.  For example, in *In re Application of Pioneer Corporation*, the Court considered an application pursuant to 28 U.S.C. § 1782 for an order to conduct discovery for use in foreign proceedings.  *In re Application of Pioneer Corporation,* 2018 WL 2146412, Case. No. MC 18-0037 (C.D. Cal., May 9, 2018).  In denying the application, the Court explained:

> The breadth of the requests suggests that Pioneer is overreaching and that requiring compliance with the requests would put an undue burden on Technicolor. For example, the subpoena defines "time period" to mean "on or after November 2001." (Appl., Exh. 1 at 6). None of the discovery requests actually uses the phrase "time period," and so, on their face, the requests appear unlimited as to time. However, even assuming that Pioneer intended to

1
2
3
4

"limit" all of its requests to November 2001 to the present, there is simply no showing that the production of nearly seventeen years' worth of documents is or would have been necessary or proportional to the litigation of the German Claim, which concerned the expiration of patents in 2012 and Pioneer's continued payments through 2014.

5
6
7
8
9

*Id*. As was the case in *In re Application of Pioneer Corporation*, Valve's subpoena is "overreaching," and "there is simply no showing that the production of [more than 20 years'] worth of documents is or would have been necessary or proportional to the litigation," which is subject to a four-year statute of limitation.

10
11
12
13
14
15

Valve's demand for production of documents dating back 20 years, particularly where 16 of those years are outside of the statute of limitations, is unreasonable and unduly burdensome. When the burden to Nexon is weighed against the value of the information to Valve, the scale tips decidedly in Nexon's favor.

16
17

      **iii.**      <u>**The Documents Sought are Either Irrelevant or**</u>
<u>**Disproportionate to the Importance of the Discovery and**</u>
<u>**Valve's Need for the Information**</u>

18
19
20
21
22
23
24
25
26
27
28

A subpoena is unduly burdensome where it seeks to compel production of documents regarding topics unrelated to or beyond the scope of the litigation. *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 813-14 (9th Cir. 2003). Moreover, "if the sought-after documents are not relevant, nor calculated to lead to the discovery of admissible evidence, then any burden whatsoever imposed [] would be by definition 'undue.'" *Compaq Computer Corp. v. Packard Bell Elec., Inc*., 163 F.R.D. 329, 335-36 (N.D. Cal. 1995). The relevance threshold is admittedly low; however, the proportionality of subpoena request must also be addressed under Fed.

R. Civ. 26.  Rule 26(b)(1) identifies six factors to be considered when determining if

the proportionality requirement has been met: the importance of the issues at stake

in the action; the amount in controversy; the parties' relative access to the relevant

information; the parties' resources; the importance of the discovery in resolving the

issues; and whether the burden or expense of the proposed discovery outweighs its

likely benefit.  Evidence is relevant if "it has any tendency to make a fact more or

less probable than it would be without the evidence and the fact is of consequence in

determining the action" Fed. R. Evid. 401. "Proportionality, on the other hand,

'focuses on the marginal utility of the discovery sought.'" *Gutierrez v. Mora*, 2019

U.S. Dist. LEXIS 231465, *10-11, Case 18-781-KS (C.D. Cal. 2019, Dec. 18, 2019)

(quoting *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig*., 180 F. Supp. 3d 273,

280 n.43 (S.D.N.Y 2016).  *See also* Moon, 232 F.R.D. 633, 637 (stating "[Courts]

weigh the burden to the subpoenaed party against the value of the information to the

serving party").

   The Subpoena commands the production of documents that are either unrelated

to the claims or defenses at issue in the underlying litigation and/or the burden

imposed on Nexon of producing such documents is disproportionate to the value of

the information to Valve.  Such requests fall generally into three categories:

(1) documents regarding Nexon's sales, (2) documents regarding Nexon's product

development and decision making, (3) requests seeking production of documents

that are already in the possession of parties to the litigation.  Each category is discussed below.

### 1.   Nexon's Sales, Both in the United States and Worldwide, are Irrelevant to Valve's Alleged Anticompetitive Conduct

Request No. 1 demands production of "[d]ocuments sufficient to show, for each month from January 1, 2003 to the present, your total sales revenues and units sold for Software for PCs, consoles, and mobile devices."  Request No. 1 goes on for more than an entire page outlining seven (7) separate categories (*i.e.*, items a-g) encompassed by the request, including one category that includes seven (7) sub-categories (i.e., items i-vii) of information.  Request nos. 2-11 outline additional categories of information and demand additional details regarding sales.  Some, but not all of requests 2-11 explicitly refer to Request No. 1.

Nexon distributes video games on the Steam platform, and all information related to such sales is already in Valve's possession.[3]  Even assuming that that Request Nos. 1-11 are intended to seek documents related to Nexon's sales outside of the Steam platform (although the Subpoena is not explicitly limited to sales outside of Steam and appears to explicitly command production of sales on the

---

[3] As explained below, Nexon also objects to the subpoena to the extent that it seeks to compel the production of information that is already in the possession of a party to the litigation.  *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 577 (N.D. Cal. 2007) ("There is simply no reason to burden nonparties when the documents sought are in possession of the party defendant.").

Steam Platform), such sales are irrelevant to whether Valve engaged in anticompetitive conduct as alleged by Plaintiffs.  There is no connection between Nexon's sales (either on the Steam Platform or otherwise) that bears on Valve's alleged anticompetitive conduct.

Nexon possesses no unique information related to the allegations at issue in the litigation.  Nexon is simply one data point among thousands of video game creators, and the value of one data point among thousands is insignificant.  Valve's answer in the litigation states: "Valve admits that Steam currently has more than 45,000 games available."  Nexon is responsible for an exceptionally small fraction of such games. A search of the Steam website for the term "Nexon" shows 43 results.  A copy of this search is attached as Exhibit E.  As such, Nexon provides a miniscule fraction of the content available on provides the total number of Nexon games on the Steam (*i.e.*, 43 games / 45,0000 games = 0.096%).  Any impact of Valve's alleged anticompetitive conduct would apply with equal force to all other game developers that distribute content through the Steam Platform.  As such, there is no "marginal utility" added by Nexon's records.

To the extent that Valve sent a similar subpoena to every entity that distributes video games on Steam (*i.e.*, all of the "Steam Partners"), there can be no dispute that Valve is engaging in a fishing expedition.  To the extent that the objective of these requests is simply to determine what proportion of sales in the gaming industry are

made on the Steam platform, more cost-effective and readily available sources of information should be utilized (e.g., Valve's own records, industry surveys, etc.).

Valve's demands for information extend beyond any claims or defenses at issue in the litigation.  For example, Request Nos. 3-7, and 9 are all directed to differentiating between games offered through "digital distribution" verses "physical packaging."  Neither the Second Amended Complaint nor Valve's answer use the phrase "physical packaging," and there appears to be no claims or defenses related to the distinction between "digital distribution" and "physical packaging."[4]

Other demands are similarly untethered to any claims or defenses in the litigation.  For example, Valve demands that Nexon produce documents identifying its "top five resellers" and the showing the "total unit sales and total sales revenues" for each such reseller.  Request Nos. 8-9.  The identities and sales volumes of Nexon's "top five resellers" over the past twenty years are of no import whatsoever to whether Valve engaged in the anticompetitive conduct alleged by Plaintiffs.

**2.  <u>Nexon's Product Development Decisions and Views Regarding Competition in the Industry are Irrelevant</u>**

_____

[4] FN. 22 in the Second Amended Complaint cites an article appearing in Newzoo, and states: "This analysis also subdivides the $36.9 billion PC Games Market into a $33.9 billion 'Boxed/Downloaded PC Games' market (a.k.a. PC Desktop Games) and a $3 billion "Browser PC Games" market, which as mentioned below, is trending downwards and primarily competes against Mobile Games."  This reference indicates that "Boxed" and "Downloaded PC Games" are considered together, and as such, the six separate requests related to this distinction are irrelevant.

The Subpoena demands production of 20 years' worth of documents related to Nexon's assessment of competition in the video game industry. Certain of these requests are quoted below:

- 12. Documents sufficient to show, from January 1, 2003 to the present, what companies and products you regard as included in the markets that include distribution of games.

- 18. All documents discussing, describing, or analyzing competition in the market or markets that include distribution of games, including all such documents you produced in discovery or otherwise in *In re: Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.) or *Epic Games, Inc. v. Apple Inc.*, No.4:20-cv-05640-YGR (N.D. Cal.).

- 21. All documents describing, referring, or relating to any policies or guidelines for pricing of Software on any Nexon distribution platform, including any policies or guidelines for pricing of games on any Nexon distribution platform that are also sold on storefronts operated by other companies.

- 21. All documents describing, referring, or relating to your decision to launch any Nexon distribution platform.

- 22. All documents describing, referring, or relating to the ease, difficulty, expense, or barriers, if any, to creating or maintaining a distribution platform in competition with others.

Again, Nexon's views regarding competition in the industry have no bearing on the dispute in the underlying litigation.  The value of the limited information that Nexon may have (as one of thousands of content publishers on Steam) is outweighed by burden of gathering such information—particularly in view of the onerous temporal and geographic scope of Valve's demand. These requests relate directly to the Nexon Group's commercial planning, investor relations, and financial

status.  Requests Nos. 12-25 are nothing more than a fishing expedition that Valve seeks to conduct at Nexon's expense.

To the extent that Nexon has any responsive documents and such documents favor the Plaintiff's position, Valve will undoubtedly argue that Nexon's opinions on these topics are irrelevant and/or that any conclusions drawn from Nexon's documents should be excluded.  Similarly, to the extent that Nexon has any documents that favor Valve's position that, the Plaintiffs will undoubtedly argue for the exclusion of Nexon's documents.  Forcing Nexon to undertake a worldwide search for documents over the past 20 years is entirely disproportionate to any need Valve may have for such information—particularly if Valve reserves its rights to later argue that such information is irrelevant or should be excluded for other reasons.

### 3.  <u>The Subpoena Commands Nexon America to Produce Documents in the Possession of Parties to the Litigation</u>

"There is simply no reason to burden nonparties when the documents sought are in possession of the party defendant." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 577 (N.D. Cal. 2007).  *See also*, *Amini Innovation Corp.*, 300 F.R.D. at 409-10 (C.D. Cal. 2014) ("Courts are particularly reluctant to require a non-party to provide discovery that can be produced by a party.").  Despite this well-established principle, Valve's subpoena explicitly demands that Nexon produce documents in the possession of parties to the litigation.

Memorandum Of Points And Authorities In Support
Of Motion To Quash Subpoena By Non-Party Nexon

Nexon distributes its games on the Steam Platform, and the salutation in the letter that accompanied the Subpoena (*i.e.*, "Dear Steam Partner") establishes that Valve and Valve's counsel are aware of this fact.  Given that Nexon's games are distributed through the Steam Platform, Valve already possesses all of the records showing the sale of Nexon's products through the Steam Platform.  Nonetheless, Request No. 1 commands Nexon to produce: "Documents sufficient to show, for each month from January 1, 2003 to the present, your total sales revenues and units sold for Software for PCs, consoles, and mobile devices."  Subparts (b)(iii)-(iv) of Request No. 1 makes this fact even more explicit by commending production of documents showing "(iii) Software not distributed through any Nexon distribution platform, that Nexon both developed and published;" and "(iv) Software, distributed through any Nexon distribution platform, that Nexon published but was developed by others…."  As alleged in the Second Amended Complaint, the Valve Platform is the primary distribution channel of Nexon's games and of thousands of other game developers.

Request No. 27 is even more explicit about purporting to require that Nexon produce documents available from parties to the litigation.

> 27. All documents and communications between you, or anyone employed by or representing you, and any employee or representative of, or attorney representing, Wolfire Games, LLC, Dark Catt Studios Holdings, Inc., or Dark Catt Studios Interactive LLC, including without limitation all documents and communications referring or relating to *In re Valve Antitrust Litigation*, No. 2:21-cv-00563-JCC (W.D. Wash.) or the lawsuits filed by Wolfire Games, LLC, Dark Catt Studios Holdings, Inc., and Dark Catt Studios Interactive

LLC consolidated therein, or the subject matter or allegations of these lawsuits.

Any document that Nexon may possess that is responsive to this request is also in the possession of the plaintiffs.  The fact that the documents sought by Request No. 27 are in the possession of the plaintiffs was specifically discussed during the conferences between counsel that preceded this motion.  Counsel for Valve specifically agreed to get back to counsel for Nexon America about whether Valve would withdraw this request.  Despite this agreement and the imminent deadline specified for Nexon America's compliance with the subpoena, counsel for Valve failed to contact counsel for Nexon America or withdraw this request.

      **b.  <u>The Subpoena Seeks to Compel Highly Confidential Information Regarding Nexon's Profit Margins, Customers, and Business Strategies</u>**

A court may quash or modify a subpoena if it requires: "disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(c)(3)(B)(i).  Customer records, pricing strategies, and profit margins are trade secrets or commercial sensitive confidential information.  *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 472-473 (N.D. Cal. 2020) (collecting cases and noting: "Courts have frequently held that customer-related information qualifies as a trade secret…")  See also, MILGRIM ON TRADE SECRETS § 1.01 (2022) (including "list of customers" in examples of trade secrets).

"Once the nonparty shows that the requested information is a trade secret or confidential commercial information, the burden shifts to the requesting party to show a substantial need for the testimony or material that cannot be otherwise met without undue hardship." *Gonzales v. Google*, 234 F.R.D. 674, 684 (N. D. Cal. 2006) (internal citations and quotation marks omitted). Moreover, the information requested from a non-party "should be narrowly drawn to meet specific needs for information." *Convolve, Inc. v. Dell, Inc*., No. C 10-80071 WHA, 2011 U.S. Dist. LEXIS 53641, at *7 (N. D. Cal. May 9, 2011) (internal citations and quotation marks omitted).

Valve's demands include, but are not limited to the following requests related to Nexon's profit margins, customer identities, business strategies, and pricing decisions. Certain of these requests are quoted below:

17. All documents, from January 1, 2003 to the present, that describe, report, or calculate the cost of (a) developing any Nexon distribution platform, (b) individual features you have added to any Nexon distribution platform since its launch, or (c) the profit margin you realized on Nexon distribution platforms each year since its launch

19. All documents you provided to, or you received from, any state, federal, or international regulator, government entity, lobbyist, trade association, or consultant referring or relating to any investigation or review of antitrust, competition, or consumer protection issues, or proposed or existing regulation involving, Nexon, Steam, or any other developers, publishers, or distributors of Software.

20. All documents describing, referring, or relating to any policies or guidelines for pricing of Software on any Nexon distribution platform, including any policies or guidelines for pricing of games on any Nexon

distribution platform that are also sold on storefronts operated by other companies.

21. All documents describing, referring, or relating to your decision to launch any Nexon distribution platform.

24. All documents describing, referring, or relating to features and functionality for cross-play between games offered on any Nexon distribution platform and any other platform, including but not limited to Steam.

25. All documents describing, referring, or relating to customers of any Nexon distribution platfom1 who are also customers of Steam, including all documents calculating, estimating, or discussing the numbers of such persons, including at specific times or during specific periods.

Nexon and Valve both publish video games through the Steam Platform.  As set forth above, it is unclear whether Valve believes it is entitled to this information merely because Nexon offers games through the Steam Platform or because it contends that Nexon possesses unique information that differentiates Nexon from the thousands of other video game providers on Steam.  To the extent that Nexon is merely one of thousands of potential data points, Valve's demand for disclosure of this sensitive information cannot survive.  To the extent that Valve concedes that Nexon has no unique information, Valve is presumably seeking the same information from countless other companies, and there is no "marginal utility" in the data provided by Nexon.  In the alternative, if Valve seeks this information because Nexon has unique insights, Valve must also concede that the unique information possessed by Nexon embodies significant commercial value.  As noted above, Nexon accounts for only 0.178% of the games on the Steam Platform, and as such,

any information uniquely available to Nexon must provide a significant competitive

advantage.

Valve has not offered any explanation that purportedly justifies its demand for

Nexon to hand over highly-sensitive competitive information.  Instead, the requests

themselves seem directed at obtaining information from Valve's competitors that

Valve can exploit for its own benefit.

### c.   <u>Nexon is Entitled to Recover its Costs and Fees Incurred in Bringing this Motion</u>

Valve's counsel has failed to comply with Rule 45(d)(1), which states that

"[a] party or attorney responsible for issuing and serving a subpoena must take

reasonable steps to avoid imposing undue burden or expense on a person subject to

the subpoena. The court for the district where compliance is required must enforce

this duty and impose an appropriate sanction—which may include lost earnings and

reasonable attorney's fees—on the party or attorney who fails to comply."  In *Mount*

*Hope Church v. Bash Back!*, 705 F.3d 418, 426 (9th Cir. 2012), the court stated that

Rule 45(d)(1) should be interpreted with restraint, lest the overuse of sanctions chill

reasonable litigation and discovery conduct.  In *Legal Voice v. Stormans Inc.*, 738

F.3d 1178 (9th Cir. 2013), the court further stated: "[W]hile failure narrowly to

tailor a subpoena may be a ground for sanctions, the district court need not impose

sanctions every time it finds a subpoena overbroad; such overbreadth may

sometimes result from normal advocacy, which we have said should not give rise to

sanctions. A court may, however, impose sanctions when a party issues a subpoena in bad faith, for an improper purpose, or in a manner inconsistent with existing law."

The Subpoena is inconsistent with existing law in at least three specific ways, each of which is detailed above.  First, the Subpoena purports to require compliance for Nexon Japan and Nexon Korea.  There can be no debate that Valve has entirely failed to provide any evidence to support its burden of establishing that Nexon America has "control" over documents in the possession or control of Nexon Japan and Nexon Korea.  This failure is inconsistent with longstanding and binding precedent holding that the burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989).

Second, the Subpoena commands production of documents and records dating back to January 2003—a period where Valve concedes that "there was no store component to Steam,"—and where the claims are restricted to a 4-year statute of limitations.  Valve has offered no explanation that could support demand for records dating back 20 years, and despite Nexon's requests, Valve has refused to withdraw these requests.

Third, the Subpoena commands production of documents and records that are in its possession and/or in the possession of the plaintiffs.  The Subpoena purports to command the production of sales record on the Steam Platform and also documents

sent by Nexon to the Plaintiffs.  Again, Valve offers no explanation for its demands, and Valve has refused to withdraw its requests despite Nexon's objections.

Similar conduct has been cited by Court in imposing an award of attorney's fees and costs.  For example, in *Casun Ivest, A.G., v. Ponder*, the Court noted that the "subpoena was clearly overbroad on its face, and, to the extent relevant, improperly sought documents from nonparty attorneys, rather than from Plaintiff," and the failure of the proponents in their "duty to either substantially limit and modify the subpoena, or withdraw it in response to [the target's] objections." *Casun Ivest, A.G., v. Ponder*, 2019 U.S. Dist. LEXIS 93971, *19 (D. Nev., Jun 4, 2019). Both of these rationales are equally applicable here.  Valve's attempts to obtain documents from a third party, rather than its own records or document requests to the plaintiffs is improper.  Further, Valve failed to withdraw or substantially modify its overbroad subpoena in response to Nexon's objections and/or during the two conferences held by counsel.

**V.**      **Conclusion**

For the foregoing reasons, Nexon America respectfully requests that the Court grant this motion and quash the Subpoena.  Nexon America further requests that the Court award Nexon's reasonably incurred fees and costs incurred in bringing this

/ / /

/ / /

1    motion pursuant to Fed. R. Civ. P. 45(d)(1).  A proposed order is submitted herewith

2    as Exhibit F.

3

4    DATED:  February 21, 2023                    Michael W. Ellison
                                                  SMITH ♦ ELLISON
5

6

7                                                 By   /S/   MICHAEL W. ELLISON
                                                      Michael W. Ellison
8                                                 Attorneys for Nexon America Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

motion to quash.mem.docx                    28

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Nexon America Inc., certifies that this brief contains 6886 words, which:

XXX complies with the word limit of L.R. 11-6.1.

☐ complies with the word limit set by court order dated _____.

DATED: February 21, 2023                    /S/   MICHAEL W. ELLISON

                                                              _____
                                                              Michael W. Ellison
                                                              Attorneys for Nexon America Inc.

# EXHIBIT A

EXHIBIT A
030



**CT Corporation**
**Service of Process Notification**
01/23/2023
CT Log Number 543072398

## Service of Process Transmittal Summary

**TO:**   KATIE WOODSON
Nexon US Holding Inc.
621 HAWAII ST
EL SEGUNDO, CA 90245-4814

**RE:**   **Process Served in California**

**FOR:**   NEXON AMERICA INC.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | I n re: Valve Antitrust Litigation vs. Nexon America Inc. |
| **CASE #:** | 221CV00563JCC |
| **NATURE OF ACTION:** | Subpoena - Business records |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 01/23/2023 at 14:15 |
| **JURISDICTION SERVED:** | California |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780126568931 |
| | Image SOP |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 330 N BRAND BLVD |
| | STE 700 |
| | GLENDALE, CA 91203 |
| | 877-467-3525 |
| | SmallBusinessTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

EXHIBIT A
031

 Wolters Kluwer

## PROCESS SERVER DELIVERY DETAILS

**Date:**                    Mon, Jan 23, 2023
**Server Name:**             Bruce Anderson

| Entity Served | NEXON AMERICA INC. |
|---|---|
| Case Number | 221CV00563JCC |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
|  |  |  |



EXHIBIT A
032



**MONTGOMERY McCRACKEN**

ATTORNEYS AT LAW

**Peter Breslauer**
Admitted in Pennsylvania

1735 Market Street
Philadelphia, PA 19103-7505
Tel: 215-772-1500

Direct Dial:   215-772-7271
Fax:            215-731-3733
Email:    pbreslauer@mmwr.com

January 20, 2023

**Via Hand Delivery**

Nexon America Inc.
c/o C T Corporation System
330 N Brand Blvd, Suite 700
Glendale, CA 91203

Re:   *In re Valve Antitrust Litigation*, No. 2:21-cv-00563-JCC (W.D. Wash.)
       Subpoena to Nexon America Inc. to Produce Documents

Dear Steam Partner:

We represent Valve Corporation in the above-captioned case, and are serving the enclosed
Subpoena to Produce Documents on you as registered agent for Nexon America Inc. ("Nexon").
Nexon is a longstanding business partner of Valve in the distribution of games and related items,
and Valve values its business relationship with Nexon.

The objective of the Subpoena is to gather information that Valve needs for its defense of
the antitrust class actions brought against it by developers Wolfire Games and Dark Catt Studios.
Valve recognizes that some of the documents Valve requests in the subpoena may contain highly
sensitive and confidential business information of Nexon. The Protective Order entered in this
case gives Nexon the opportunity to limit access to those kinds of documents and the information
contained in them to Valve's and the plaintiffs' outside counsel, experts, and consultants for use
in this case, but not Valve's or the plaintiffs' employees, by designating them "Highly Confi-
dential – Attorney's Eyes Only." We have enclosed a copy of the Protective Order with the
Subpoena. Please see section 2.b.

Under Federal Rule of Civil Procedure 45, any objection to the Subpoena is due fourteen
days after your agent received it, and the Subpoena states that the requested documents are to be
produced by February 20, 2023. We invite Nexon to discuss with us any extension of those dates
you may need.

At the time of production, any physical copies of documents should be produced at the
following address, although we would be happy to receive the documents electronically in lieu of
physical production:

MONTGOMERY McCRACKEN WALKER & RHOADS LLP

PENNSYLVANIA • NEW YORK • NEW JERSEY • DELAWARE

A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP
JOHN J. LEVY, NEW JERSEY RESPONSIBLE PARTNER

EXHIBIT A
033

Montgomery McCracken Walker & Rhoads LLP

Nexon America Inc.
January 20, 2023
Page 2

> Fox Rothschild LLP
> Attn: Meeghan Tirtasaputra
> 10250 Constellation Boulevard, Suite 900
> Los Angeles, CA 90067

We look forward to discussing the Subpoena with your counsel and will do our best to accommodate your needs.

Very truly yours,

*/s/ Peter Breslauer*
Peter Breslauer

EXHIBIT A
034

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| In re: Valve Antitrust Litigation | ) | |
|---|---|---|
| *Plaintiff* | ) | Civil Action No. 2:21-cv-00563-JCC |
| v. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: 　Nexon America Inc.
　　c/o C T Corporation System, 330 N. Brand Blvd, Suite 700, Glendale, CA 91203

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A

| Place: Fox Rothschild LLP, Attn: Meeghan Tirtasaputra | Date and Time: |
|---|---|
| 　　10250 Constellation Boulevard, Suite 900<br>　　Los Angeles, CA 90067 | 　　02/20/2023 10:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: ·　01/20/2023

| CLERK OF COURT | | |
|---|---|---|
| | OR | /s/ Peter Breslauer |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* 　Valve Corporation , who issues or requests this subpoena, are:
Peter  Breslauer, Montgomery McCracken Walker & Rhoads LLP, 1735 Market Street, Philadelphia, PA 19103, 215-772-7271, pbreslauer@mmwr.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT A
035

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:21-cv-00563-JCC

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                _____
                                                                    *Server's signature*

                                                       _____
                                                                    *Printed name and title*

                                                       _____
                                                                    *Server's address*

Additional information regarding attempted service, etc.:

   

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## INSTRUCTIONS AND DEFINITIONS

1.     This Subpoena seeks production of documents in connection with *In re Valve Antitrust Litigation*, No. 2:21-cv-00563-JCC (W.D. Wash.), in which a Consolidated Amended Class Action Complaint was filed on August 26, 2022 (Dkt. # 99).

2.     If any portion of a document is responsive to any Document Request, the entire document must be produced.

3.     All documents produced electronically are to include all available metadata fields, including but not limited to the date created and any custodian information.

4.     These document requests are intended to cover all documents and things in your charge or possession as well as those subject to your custody or control, whether in your possession, at the office of your attorneys, or at any other place or in the possession of any other person or entity subject to your control.

5.     If you cannot respond to any of the following Document Requests in full after exercising due diligence in attempting to secure the documents necessary to do so, respond to the fullest extent possible, producing all documents within your possession, custody, or control as of the date of your response to these Document Requests, and explain why you cannot respond in full and state the nature of the documents, and the information therein, that you cannot produce.

6.     Unless otherwise specified, the period during which documents that are to be produced in response to these Document Requests were created is January 1, 2003 to the present.

7.     If you claim any privilege, whether based on statute or otherwise, as a ground for not responding to a request or any portion thereof, set forth each and every fact and ground upon which the privilege is based, including all facts required under Fed. R. Civ. P. 45(e)(2)(A) sufficient for the Court to make a full determination whether the claim of privilege is valid.

8.     If you claim that any document you produce contains a trade secret or other confidential research, development, or commercial information that should not be revealed or be revealed only in a specified way, produce the document subject to the procedures set forth in the

Stipulated Protective Order filed in this action on August 16, 2022 (Dkt. # 95), a copy of which is enclosed with this Subpoena.

9.      The singular includes the plural, and the connectives "and" and "or" are to be construed disjunctively or conjunctively, so as to bring within the scope of your responses all information that might otherwise be construed as outside the scope of a request.

10.     "Console" means a specialized computer other than a PC, either stationary or handheld, designed to play games. For purposes of this definition, "console" also includes Nintendo Switch.

11.     "Develop" means to create a game.

12.     "Distribution platform" means, without limitation, websites (*e.g.*, https://www.nexon.com/, https://store.steampowered.com/), streaming media providers, websites of game developers and publishers, launchers including Nexon Launcher, cloud-based game streaming services, and other facilities designed or operated for distribution of games via the Internet.

13.     "DLC" and "downloadable content" mean supplemental content for a released game, distributed through the Internet, including through a distribution platform, by the game's publisher, developer, or another entity.

14.     "Document" means all documents, electronically stored information, and things described in Fed. R. Civ. P. 34(a)(1).

15.     "Game" means, without limitation, video games designed for operation, locally or while connected to a server, streaming media, or other electronic service, on personal computers, consoles, smartphones, or other electronic computing devices, whether in individual or multiplayer modes, and whether distributed over distribution platforms, by retail stores, online resellers, or by other means.

16.     "In-game purchases" means goods and services purchased from inside a game, including points, credits, and other items that can be exchanged for goods or services.

EXHIBIT A
039

17.     "Mobile device" means a cellular telephone that includes additional software functions, such as email or Internet browsing capability.

18.     "Nexon distribution platform" means a distribution platform that you own, operate or market for the distribution of Software.

19.     "PC" and "personal computer" mean a computer equipped with a microprocessor designed for use by one person at a time, but does not mean other devices such as gaming consoles, tablets, and cellular telephones and smartphones. By way of example, "PC" includes Windows-based computers, Apple iMac and MacBook computers, Linux-based personal computers, and Chromebooks. For purposes of this definition, "PC" also includes Steam Deck.

20.     "Person" shall be deemed to include, in the plural as well as singular, any natural person, firm, association, partnership, joint venture, corporation or other entity, unless the context otherwise indicates.

21.     "Publish" means to market and distribute a game.

22.     "Referring to or relating to" means pertaining to, referring to, relating to, alluding to, connected with, commenting on, regarding, comprising, discussing, showing, describing, mentioning, memorializing, analyzing, embodying, reflecting, constituting, or evidencing, in whole or in part.

23.     "Software" means games, DLC, and in-game purchases.

24.     "You" and "Nexon" mean Nexon America Inc. and each of its agents, representatives, employees, contractors, and any other person, predecessors, parent companies, subsidiaries, acquired companies, and businesses, partnerships, affiliates, and entities, of whatever kind, in which any of them has a business interest or which is subject to your control, including without limitation Nexon Co. Ltd., Nexon Corporation, NX Games Inc., and Nexon US Holding Inc.

EXHIBIT A
040

**DOCUMENT REQUESTS**

1.    Documents sufficient to show, for each month from January 1, 2003 to the present, your total sales revenues and units sold for Software for PCs, consoles, and mobile devices. For purposes of responding to this Request,

a.    The sales revenue and unit sales data should be stated separately for games, DLC, and in-game purchases;

b.    The sales revenue and unit sales data should be stated separately for

    i.    Software, not distributed through any Nexon distribution platform, that Nexon published but was developed by others;

    ii.    Software, not distributed through any Nexon distribution platform, that Nexon developed but was published by others;

    iii.    Software not distributed through any Nexon distribution platform, that Nexon both developed and published;

    iv.    Software, distributed through any Nexon distribution platform, that Nexon published but was developed by others;

    v.    Software, distributed through any Nexon distribution platform, that Nexon developed but was published by others;

    vi.    Software, distributed through any Nexon distribution platform, that Nexon both developed and published; and

    vii.    Software, distributed through any Nexon distribution platform, that was neither developed nor published by you.

c.    The sales revenue and unit sales data should be stated separately for PCs, consoles, and mobile devices;

d.    The sales revenue and unit sales data should separately reflect sales to US purchasers and sales to purchasers in the rest of the world;

e.    The sales revenue and unit sales data should include, separately and for each company, sales of Software by all parent companies or companies you acquired,

4

operated, or in which you had a business interest from January 1, 2003 to the present;

    f.   State, by month, whether the sales revenue data produced in response to this Request reflect wholesale prices, retail prices (*i.e.,* consumer prices), or some other measure. To the extent possible, please provide retail prices in responding to this Request; and

    g.   The sales revenue data should be net sales (gross sales less returns, less chargebacks from credit card companies, payment processors or others, less sales tax, and less value-added tax).

2.    Documents sufficient to show, for each month from January 1, 2003 to the present for which you produce total sales revenue and unit sales data in response to Request no. 1:

    a.   The revenue you received or retained for Software not distributed through any Nexon distribution platform, including without limitation for Software offered on distribution platforms other than any Nexon distribution platform and Software sold in wholesale transactions for resale by others;

    b.   The revenue share (sometimes referred to as the "commission") you received for Software published by others and distributed through any Nexon distribution platform; and

    c.   The revenue you retained, net of payments to others, for Software published by you and distributed through any Nexon distribution platform.

3.    Documents sufficient to show, for each month from January 1, 2003 to the present for which you produce total sales revenue and unit sales data in response to Request no. 1, the percentage of reported total sales revenues and units attributable to sales in physical packaging and to digital distribution of Software designed for operation on consoles.

4.    Documents sufficient to show, for each month from January 1, 2003 to the present for which you produce total sales revenue and unit sales data in response to Request no. 1, the

percentage of reported total sales revenues and units attributable to sales in physical packaging and to digital distribution of Software designed for operation on PCs.

5.     Documents sufficient to show the proportion of total sales revenues and units sold, described in the documents produced in response to Request no. 1, that were attributable to physical packaging of Software that contained codes or keys to enable downloading of the software in contrast to physical packaging that contained digital media, *e.g.*, CDs or DVDs.

6.     Documents sufficient to show how, rather than providing digital media inside physical packaging, the provision of codes or keys for downloading and activation of games in physical packaging affected the revenues, costs, and margins of the Software sold by you.

7.     Documents sufficient to show how, rather than providing digital media inside physical packaging, the online distribution of codes or keys for downloading and activation of games affected the revenues, costs, and margins of the Software sold by you.

8.     Documents sufficient to show how the provision, at no charge to publishers, of codes or keys for downloading and activation of games affected the revenues, costs, and margins of the Software sold by you.

9.     Documents sufficient to determine, separately by total unit sales and total sales revenues, the top five resellers to which you distributed Software in physical packaging, and the corresponding total unit sales and total sales revenues for each reseller so identified.

10.     Documents sufficient to determine, separately by total unit sales and total sales revenues, the top five resellers to which you distributed Software for digital download, and the corresponding total unit sales and total sales revenues for each reseller so identified.

11.     Documents sufficient to show for each month from January 1, 2003 to the present, the average amount of the total sales revenue that was received by developers of Software for which you acted as a publisher. For purposes of this Request, "developers" refers to persons who are not your employees or agents, and includes entities that are separately organized from you and not divisions or business units otherwise under your control.

EXHIBIT A
043

12.     Documents sufficient to show, from January 1, 2003 to the present, what companies and products you regard as included in the markets that include distribution of games.

13.     Documents sufficient to show, from January 1, 2003 to the present, whether you regard Valve as a competitor to Nexon in sales of games, and whether you regard Steam as a competitor to any Nexon distribution platform.

14.     All documents, from January 1, 2003 to the present, that list, compare, count, analyze, or describe one or more features of any Nexon distribution platform and Steam.

15.     All documents, from January 1, 2003 to the present, that discuss your potential or actual adoption, on any Nexon distribution platform, of a feature of Steam or one similar to a feature of Steam.

16.     All documents, from January 1, 2003 to the present, that calculate, discuss, compare, or describe the market share held by Nexon or Steam.

17.     All documents, from January 1, 2003 to the present, that describe, report, or calculate the cost of (a) developing any Nexon distribution platform, (b) individual features you have added to any Nexon distribution platform since its launch, or (c) the profit margin you realized on Nexon distribution platforms each year since its launch.

18.     All documents discussing, describing, or analyzing competition in the market or markets that include distribution of games, including all such documents you produced in discovery or otherwise in *In re: Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.) or *Epic Games, Inc. v. Apple Inc.*, No.4:20-cv-05640-YGR (N.D. Cal.).

19.     All documents you provided to, or you received from, any state, federal, or international regulator, government entity, lobbyist, trade association, or consultant referring or relating to any investigation or review of antitrust, competition, or consumer protection issues, or proposed or existing regulation involving, Nexon, Steam, or any other developers, publishers, or distributors of Software.

20.     All documents describing, referring, or relating to any policies or guidelines for pricing of Software on any Nexon distribution platform, including any policies or guidelines for

7

pricing of games on any Nexon distribution platform that are also sold on storefronts operated by other companies.

21.   All documents describing, referring, or relating to your decision to launch any Nexon distribution platform.

22.   All documents describing, referring, or relating to the ease, difficulty, expense, or barriers, if any, to creating or maintaining a distribution platform in competition with others.

23.   All documents relating to the reasons you distributed (or decided not to distribute) games on other stores or distribution platforms, including Steam, instead of or in addition to Nexon distribution platforms, including the reasons you stopped releasing games on Steam or began doing so again (if you ever made such decisions).

24.   All documents describing, referring, or relating to features and functionality for cross-play between games offered on any Nexon distribution platform and any other platform, including but not limited to Steam.

25.   All documents describing, referring, or relating to customers of any Nexon distribution platform who are also customers of Steam, including all documents calculating, estimating, or discussing the numbers of such persons, including at specific times or during specific periods.

26.   All documents describing, referring, or relating to *In re Valve Antitrust Litigation*, No. 2:21-cv-00563-JCC (W.D. Wash.) or the lawsuits filed by Wolfire Games, LLC, Dark Catt Studios Holdings, Inc., and Dark Catt Studios Interactive LLC consolidated therein.

27.   All documents and communications between you, or anyone employed by or representing you, and any employee or representative of, or attorney representing, Wolfire Games, LLC, Dark Catt Studios Holdings, Inc., or Dark Catt Studios Interactive LLC, including without limitation all documents and communications referring or relating to *In re Valve Antitrust Litigation*, No. 2:21-cv-00563-JCC (W.D. Wash.) or the lawsuits filed by Wolfire Games, LLC, Dark Catt Studios Holdings, Inc., and Dark Catt Studios Interactive LLC consolidated therein, or the subject matter or allegations of these lawsuits.

8

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| IN RE VALVE ANTITRUST LITIGATION | Case No. 2:21-cv-00563-JCC<br><br>**STIPULATED PROTECTIVE ORDER**<br><br>**NOTE ON MOTION CALENDAR:**<br>**AUGUST 12, 2022** |

PURPOSES AND LIMITATIONS

Discovery in this action is likely to involve production of confidential, proprietary, or private information for which special protection may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this agreement is consistent with LCR 26(c). It does not confer blanket protection on all disclosures or responses to discovery, the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles, and it does not presumptively entitle parties to file confidential information under seal.

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 1

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4400
Seattle, WA 98154
206.624.3600

EXHIBIT A
046

1    2.    "CONFIDENTIAL" and "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY"

2    MATERIAL

3         a.    "CONFIDENTIAL" MATERIAL

4         "Confidential" material shall include the following information, documents, and tangible

5    things produced or otherwise exchanged:

6              i.    Non-public product, product use, or business plan or strategy information,

7         including research and development and product use data; market information; proprietary

8         product development or use information; non-public financial, sales, profitability, costs, or

9         other business data, metrics or projections.

10             ii.    Proprietary, commercial, or client information, which is defined as:

11                  A.    Research, development, or commercial information that is of a

12        competitively sensitive nature and that a reasonably prudent business person in the

13        applicable field would not release to or share with the public in the ordinary course

14        of business, and the release of which would likely cause proprietary, competitive,

15        or economic harm; or

16                  B.    "Trade secret," as set forth in the Washington Trade Secrets Act,

17        RCW 19.108.010, meaning information, including a formula, pattern, compilation,

18        program, device, method, technique, or process that:

19                       (1) Derives independent economic value, actual or potential, from not

20                  being generally known to, and not being readily ascertainable by proper means

21                  by, other persons who can obtain economic value from its disclosure or use;

22                  and

23                       (2) Is the subject of efforts that are reasonable under the circumstances

24                  to maintain its secrecy.

25             iii.    Non-public information received from, belonging to, or regarding third

26        parties that is designated as confidential or protected under another agreement (such as a

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 2

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4400
SEATTLE, WA 98154
206.624.3600

1   non-disclosure agreement or a contract with a confidentiality provision) and which the

2   producing party is contractually obligated to keep confidential.

3         b.    "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY" MATERIAL

4         "Highly Confidential – Attorney's Eyes Only" material shall include the following

5   information, documents, and tangible things produced or otherwise exchanged:

6             i.    Financial, proprietary, commercial, business, research and development, or

7   customer/user/client information, that is of a highly competitively sensitive nature and that

8   a reasonably prudent business person in the applicable field would not release to or share

9   with the public in the ordinary course of business, and the release of which is likely to

10   cause proprietary, competitive, or economic harm;

11             ii.    Information related to product users, including but not limited to Steam

12   users and Steam account information, or employees, which is not in the ordinary course of

13   business made publicly available, is not of legitimate concern to the public, and which a

14   reasonable product user or employee might consider personal or private; or

15             iii.    Information produced, obtained, or used in any other litigation, court

16   proceeding, or government action that was designated in that proceeding as "Highly

17   Confidential," "Attorneys' Eyes Only," or similar designation indicating an intent to

18   provide a high degree of protection of the confidentiality of such information.

19   3.    SCOPE

20         The protections conferred by this agreement cover not only confidential material (as

21   defined above) and Highly Confidential – Attorney's Eyes Only material (as defined above), but

22   also (1) any information copied or extracted from confidential material or Highly Confidential –

23   Attorney's Eyes Only material; (2) all copies, excerpts, summaries, or compilations of confidential

24   material or Highly Confidential – Attorney's Eyes Only material; and (3) any testimony,

25   conversations, or presentations by parties or their counsel that might reveal confidential material

26   or Highly Confidential – Attorney's Eyes Only material.

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 3

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4400
SEATTLE, WA 98154
206.624.3600

1  However, the protections conferred by this agreement do not cover information that is in

2  the public domain or becomes part of the public domain through trial or otherwise.

3  4.  **ACCESS TO AND USE OF CONFIDENTIAL MATERIAL AND HIGHLY**

4  **CONFIDENTIAL – ATTORNEY'S EYES ONLY MATERIAL**

5  4.1  Basic Principles. A receiving party may use confidential material and Highly

6  Confidential – Attorney's Eyes Only material that is disclosed or produced by another party or by

7  a non-party in connection with this case only for prosecuting, defending, or attempting to settle

8  this litigation. Confidential material and Highly Confidential – Attorney's Eyes Only material may

9  be disclosed only to the categories of persons and under the conditions described in this agreement.

10 Confidential material and Highly Confidential – Attorney's Eyes Only material must be stored and

11 maintained by a receiving party at a location and in a secure manner that ensures that access is

12 limited to the persons authorized under this agreement.

13 4.2  Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered

14 by the court or permitted in writing by the designating party, a receiving party may disclose any

15 confidential material only to:

16 (a)  the receiving party's counsel of record in this action, as well as employees

17 of counsel to whom it is reasonably necessary to disclose the information for this litigation;

18 (b)  the officers, directors, and employees (including in house counsel) of the

19 receiving party to whom disclosure is reasonably necessary for this litigation;

20 (c)  experts and consultants to whom disclosure is reasonably necessary for this

21 litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

22 (d)  the court, court personnel, and court reporters and their staff;

23 (e)  copy or imaging services retained by counsel to assist in the duplication of

24 confidential material, provided that counsel for the party retaining the copy or imaging service

25 instructs the service not to disclose any confidential material to third parties and to immediately

26 return all originals and copies of any confidential material;

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 4

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4400
SEATTLE, WA 98154
206.624.3600

EXHIBIT A
049

1       (f)    during their depositions, witnesses in the action to whom disclosure is

2   reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound"

3   (Exhibit A), unless otherwise agreed by the designating party or ordered by the court. Pages of

4   transcribed deposition testimony or exhibits to depositions that reveal confidential material must

5   be separately bound by the court reporter and may not be disclosed to anyone except as permitted

6   under this agreement;

7       (g)    the author or recipient of a document containing the information or a

8   custodian or other person who otherwise possessed or knew the information.

9       (h)    a party's witnesses designated as 30(b)(6) representatives with respect to

10   documents produced by the party.

11       4.3    Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY"

12   Material.  Unless otherwise ordered by the court or permitted in writing by the party or non-party

13   designating such material, all information or items designated as "HIGHLY CONFIDENTIAL –

14   ATTORNEY'S EYES ONLY" material shall not be disclosed to any person except those listed in

15   subparagraphs (a), (c), (d), (e), (g) and (h) of paragraph 4.2 above.

16       4.4    Filing Confidential Material and Highly Confidential – Attorney's Eyes Only

17   Material. Before filing confidential material or Highly Confidential – Attorney's Eyes Only

18   material, or discussing or referencing such material in court filings, the filing party shall confer

19   with the designating party, in accordance with Local Civil Rule 5(g)(3)(A), to determine whether

20   the designating party will remove the confidential or Highly Confidential – Attorney's Eyes Only

21   designation, whether the document can be redacted, or whether a motion to seal or stipulation and

22   proposed order is warranted. During the meet and confer process, the designating party must

23   identify the basis for sealing the specific confidential or Highly Confidential – Attorney's Eyes

24   Only information at issue, and the filing party shall include this basis in its motion to seal, along

25   with any objection to sealing the information at issue.  Local Civil Rule 5(g) sets forth the

26   procedures that must be followed and the standards that will be applied when a party seeks

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 5

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4400
SEATTLE, WA 98154
206.624.3600

EXHIBIT A
050

1  permission from the court to file material under seal.   A party who seeks to maintain the

2  confidentiality of its information must satisfy the requirements of Local Civil Rule 5(g)(3)(B),

3  even if it is not the party filing the motion to seal.  Failure to satisfy this requirement will result in

4  the motion to seal being denied, in accordance with the strong presumption of public access to the

5  Court's files.

6  5.     DESIGNATING PROTECTED MATERIAL

7        5.1    Exercise of Restraint and Care in Designating Material for Protection. Each party

8  or non-party that designates information or items for protection under this agreement must take

9  care to limit any such designation to specific material that qualifies under the appropriate

10  standards. The designating party must designate for protection only those parts of material,

11  documents, items, or oral or written communications that qualify, so that other portions of the

12  material, documents, items, or communications for which protection is not warranted are not swept

13  unjustifiably within the ambit of this agreement.

14        Mass, indiscriminate, or routinized designations are prohibited. Designations that are

15  shown to be clearly unjustified or that have been made for an improper purpose (*e.g.,* to

16  unnecessarily encumber or delay the case development process or to impose unnecessary expenses

17  and burdens on other parties) expose the designating party to sanctions.

18        If it comes to a designating party's attention that information or items that it designated for

19  protection do not qualify for protection, the designating party must promptly notify all other parties

20  that it is withdrawing the mistaken designation.

21        5.2    Manner and Timing of Designations. Except as otherwise provided in this

22  agreement (see, *e.g.,* second paragraph of section 5.2(b) below), or as otherwise stipulated or

23  ordered, disclosure or discovery material that qualifies for protection under this agreement must

24  be clearly so designated before or when the material is disclosed or produced.

25        (a)    Information in documentary form: (*e.g.,* paper or electronic documents and

26  deposition exhibits, but excluding transcripts of depositions or other pretrial or trial proceedings),

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 6

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4400
SEATTLE, WA 98154
206.624.3600

EXHIBIT A
051

1   the designating party must affix the words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL

2   – ATTORNEY'S EYES ONLY" to each page that contains confidential material or Highly

3   Confidential – Attorney's Eyes Only material. If only a portion or portions of the material on a

4   page qualifies for protection, the producing party also must clearly identify the protected portion(s)

5   (*e.g.*, by making appropriate markings in the margins).

6            (b)      Testimony given in deposition or in other pretrial proceedings: Deposition

7   testimony and the transcripts and video recordings thereof of depositions conducted during pretrial

8   discovery in this litigation shall be treated as HIGHLY CONFIDENTIAL – ATTORNEY'S EYES

9   ONLY for a period of 40 days, or for as many days as the parties shall agree, after receipt of such

10  deposition transcript and/or video recordings to allow time for the deponent or counsel for that

11  deponent, or any party or non-party or its counsel, to notify all parties of any HIGHLY

12  CONFIDENTIAL – ATTORNEY'S EYES ONLY or CONFIDENTIAL Information contained

13  therein. If a party or non-party desires to protect CONFIDENTIAL or HIGHLY CONFIDENTIAL

14  – ATTORNEY'S EYES ONLY information at trial, the issue should be addressed during the pre-

15  trial conference.

16           (c)      Other tangible items: the producing party must affix in a prominent place

17  on the exterior of the container or containers in which the information or item is stored the words

18  "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY." If only a

19  portion or portions of the information or item warrant protection, the producing party, to the extent

20  practicable, shall identify the protected portion(s).

21           5.3      Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to

22  designate qualified information or items does not, standing alone, waive the designating party's

23  right to secure protection under this agreement for such material. Upon timely correction of a

24  designation, the receiving party must make reasonable efforts to ensure that the material is treated

25  in accordance with the provisions of this agreement.

26

STIPULATED PROTECTIVE ORDER                          **FOX ROTHSCHILD LLP**
(2:21-CV-00563-JCC) - 7                              1001 FOURTH AVENUE, SUITE 4400
                                                     SEATTLE, WA 98154
                                                     206.624.3600

6.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

    6.1    Timing of Challenges. Any party or non-party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a designating party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

    6.2    Meet and Confer. The parties must make every attempt to resolve any dispute regarding confidential or Highly Confidential – Attorney's Eyes Only designations without court involvement. Any motion regarding confidential or Highly Confidential – Attorney's Eyes Only designations or for a protective order must include a certification, in the motion or in a declaration or affidavit, that the movant has engaged in a good faith meet and confer conference with other affected parties in an effort to resolve the dispute without court action. The certification must list the date, manner, and participants to the conference. A good faith effort to confer requires a face-to-face meeting or a telephone conference.

    6.3    Judicial Intervention. If the parties cannot resolve a challenge without court intervention, the designating party may file and serve a motion to retain confidentiality under Local Civil Rule 7 (and in compliance with Local Civil Rule 5(g), if applicable). The burden of persuasion in any such motion shall be on the designating party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the challenging party to sanctions. All parties shall continue to maintain the material in question as confidential or Highly Confidential – Attorney's Eyes Only until the court rules on the challenge.

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 8

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4400
SEATTLE, WA 98154
206.624.3600

EXHIBIT A
053

7.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY" that party must:

     (a)    promptly notify the designating party in writing and include a copy of the subpoena or court order;

     (b)    promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this agreement. Such notification shall include a copy of this agreement; and

     (c)    cooperate with respect to all reasonable procedures sought to be pursued by the designating party whose confidential material or Highly Confidential – Attorney's Eyes Only material may be affected.

8.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a receiving party learns that, by inadvertence or otherwise, it has disclosed confidential material or Highly Confidential – Attorney's Eyes Only material to any person or in any circumstance not authorized under this agreement, the receiving party must immediately (a) notify in writing the designating party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the protected material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this agreement, and (d) request that such person or persons execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

9.    INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a producing party gives notice to receiving parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 9

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4400
SEATTLE, WA 98154
206.624.3600

EXHIBIT A
054

1   receiving parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision

2   is not intended to modify whatever procedure may be established in an e-discovery order or

3   agreement that provides for production without prior privilege review. The parties agree to the

4   entry of a non-waiver order under Fed. R. Evid. 502(d) as set forth herein.

5   10.    NON TERMINATION AND RETURN OF DOCUMENTS

6          Within 60 days after the termination of this action, including all appeals, each receiving

7   party must return all confidential material and Highly Confidential – Attorney's Eyes Only

8   material to the producing party, including all copies, extracts and summaries thereof. Alternatively,

9   the parties may agree upon appropriate methods of destruction.

10          Notwithstanding this provision, counsel are entitled to retain one archival copy of all

11   documents filed with the court, trial, deposition, and hearing transcripts, correspondence,

12   deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work

13   product, even if such materials contain confidential material or Highly Confidential – Attorney's

14   Eyes Only material.

15          The confidentiality obligations imposed by this agreement shall remain in effect until a

16   designating party agrees otherwise in writing or a court orders otherwise.

17

18

19

20

21

22

23

24

25

26

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 10

EXHIBIT A
055

1    IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

2    DATED this 12th day of August, 2022.

3    s/ Alicia Cobb                          s/ Stephanie L. Jensen

4    Alicia Cobb, WSBA #48685              Stephanie L. Jensen, WSBA #42042
     QUINN EMANUEL URQUHART &             WILSON SONSINI GOODRICH &
5    SULLIVAN, LLP                        ROSATI P.C.
     1109 First Avenue, Suite 210         701 Fifth Avenue, Suite 5100
6    Seattle, Washington 98101            Seattle, WA 98104-7036
     Telephone (206) 905-7000             Telephone (206) 883-2500
7    Fax (206) 905-7100                   Fax (206) 883-2699
     aliciacobb@quinnemanuel.com          sjensen@wsgr.com
8
     Steig D. Olson (pro hac vice)        Kenneth R. O'Rourke (pro hac vice)
9    David LeRay (pro hac vice)           Scott A. Sher (pro hac vice)
     QUINN EMANUEL URQUHART &             Allison B. Smith (pro hac vice)
10   SULLIVAN, LLP                        WILSON SONSINI GOODRICH &
     51 Madison Avenue                    ROSATI, P.C.
11   New York, New York 10010             1700 K Street, NW, Suite 500
     Telephone (212) 849-7231             Washington, DC 20006
12   Fax (212) 849-7100                   Telephone (202) 973-8800
     steigolson@quinnemanuel.com          Fax (202) 973-8899
13                                        korourke@wsgr.com
     Adam Wolfson (pro hac vice)          ssher@wsgr.com
14   QUINN EMANUEL URQUHART &             allison.smith@wsgr.com
     SULLIVAN, LLP
15   865 S. Figueroa St., 10th Floor      W. Joseph Bruckner (pro hac vice)
     Los Angeles, California 90017        Joseph C. Bourne (pro hac vice)
16   Telephone (213) 443-3285             LOCKRIDGE GRINDAL NAUEN P.L.L.P.
     Fax (213) 443-3100                   100 Washington Avenue S, Suite 2200
17   adamwolfson@quinnemanuel.com         Minneapolis, MN 55401
                                          Telephone: (612) 339-6900
18   Charles Stevens (pro hac vice)       Fax: (612) 339-0981
     QUINN EMANUEL URQUHART &             wjbruckner@locklaw.com
19   SULLIVAN, LLP                        jcbourne@locklaw.com
     50 California St., 22nd Floor
20   San Francisco, CA 94111              Proposed Interim Co-Lead Counsel
     Telephone (415) 875-6600
21   Fax (415) 875-6700
     charliestevens@quinnemanuel.com
22
     Proposed Interim Co-Lead Counsel
23

24

25

26

STIPULATED PROTECTIVE ORDER                          FOX ROTHSCHILD LLP
(2:21-CV-00563-JCC) - 11                              1001 FOURTH AVENUE, SUITE 4400
                                                      SEATTLE, WA 98154
                                                      206.624.3600

1

David Golden (*pro hac vice*)
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., 22nd Floor
Washington, D.C. 20004
Telephone (202) 204-4527
Fax (202) 204-3501
dgolden@constantinecannon.com

A. Owen Glist (*pro hac vice*)
Ankur Kapoor (*pro hac vice*)
Jeffrey I. Shinder (*pro hac vice*)
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone (212) 350-2700
Fax (212) 350-2701
oglist@constantinecannon.com

*Proposed Interim Co-Lead Counsel*

Kenneth J. Rubin (*pro hac vice*)
Timothy B. McGranor (*pro hac vice*)
Kara M. Mundy (*pro hac vice*)
VORYS, SATER, SEYMOUR AND
  PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
Telephone (614) 464-6400
Fax (614) 719-4796
kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com

Thomas N. McCormick (*pro hac vice*)
VORYS, SATER, SEYMOUR AND
  PEASE LLP
4675 MacArthur Court, Suite 700
Newport Beach, California 92660
Phone (949) 526-7903 | Fax (949) 383-2384
tnmccormick@vorys.com

*Proposed Interim Executive Committee
Member*

s/ *Gavin W. Skok*

Gavin W. Skok, WSBA #29766
FOX ROTHSCHILD LLP
1001 Fourth Avenue, Suite 4400
Seattle, WA 98154
Telephone: (206) 624-3600
Fax: (206) 389-1708
gskok@foxrothschild.com

Kristen Ward Broz
FOX ROTHSCHILD LLP
2020 K. St. NW, Ste. 500
Washington, DC 20006
Telephone (202) 794-1220
Fax (202) 461-3102
kbroz@foxrothschild.com

Charles B. Casper (*pro hac vice*)
MONTGOMERY McCRACKEN WALKER
& RHOADS LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103
Telephone (215) 772-1500
ccasper@mmwr.com

*Attorneys for Defendant Valve Corporation*

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 12

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4400
Seattle, WA 98154
206.624.3600

EXHIBIT A
057

1     PURSUANT TO STIPULATION, IT IS SO ORDERED

2     IT IS FURTHER ORDERED that pursuant to Fed. R. Evid. 502(d), the production of any

3  documents in this proceeding shall not, for the purposes of this proceeding or any other federal or

4  state proceeding, constitute a waiver by the producing party of any privilege applicable to those

5  documents, including the attorney-client privilege, attorney work-product protection, or any other

6  privilege or protection recognized by law.

7

8     DATED this 16th day of August 2022.

9

10

11

12                  John C. Coughenour
                      UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 13

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4400
SEATTLE, WA 98154
206.624.3600

EXHIBIT A
058

<u>EXHIBIT A</u>

<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of

perjury that I have read in its entirety and understand the Stipulated Protective Order that was

issued by the United States District Court for the Western District of Washington on _____

[date] in the case of *In re Valve Antitrust Litigation*, Case No. 2:21-cv-00563-JCC . I agree to

comply with and to be bound by all the terms of this Stipulated Protective Order and I understand

and acknowledge that failure to so comply could expose me to sanctions and punishment in the

nature of contempt. I solemnly promise that I will not disclose in any manner any information or

item that is subject to this Stipulated Protective Order to any person or entity except in strict

compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Western District of Washington for the purpose of enforcing the terms of this Stipulated Protective

Order, even if such enforcement proceedings occur after termination of this action.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

STIPULATED PROTECTIVE ORDER
(2:21-CV-00563-JCC) - 14

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4400
SEATTLE, WA 98154
206.624.3600

EXHIBIT A
059

# EXHIBIT B

1

2

UNITED STATES DISTRICT COURT

3

WESTERN DISTRICT OF WASHINGTON

4

Wolfire Games LLC et al.

                 Plaintiffs,        )

5

                                  )

v.                               )

6

                                  )

Valve Corporation,

7

               Defendant.        )

8

9

Case No. 2:21-cv-00563-JCC

**OBJECTIONS TO SUBPOENA**

10

_____

11

      Neaxon America, Inc. ("Nexon") hereby responds to the subpoena dated January 20, 2023,

12

issued in the above-referenced matter.

13

      **REQUEST NO. 1:**   Documents sufficient to show for each month from January 1, 2003

14

to the present, your total sales revenues and units sold for Software for PCs, consoles, and mobile

15

devices. For purposes of responding to this Request,

16

17

     a.   The sales revenue and unit sales data should be stated separately for games, DLC, and

18

          in-game purchases;

19

     b.   The sales revenue and unit sales data should be stated separately for

20

21

          i.   Software, not distributed through any Nexon distribution platform, that Nexon

22

             published but was developed by others;

23

          ii.   Software, not distributed through any Nexon distribution platform, that Nexon

24

             developed but was published by others;

25

          iii.   Software not distributed through any Nexon distribution platform, that Nexon

26

             both developed and published;

27

28

1

iv.   Software, distributed through any Nexon distribution platform, that Nexon published but was developed by others;

v.   Software, distributed through any Nexon distribution platform, that Nexon developed but was published by others;

vi.   Software, distributed through any Nexon distribution platform, that Nexon both developed and published; and

vii.   Software, distributed through any Nexon distribution platform, that was neither developed nor published by you.

c.   The sales revenue and unit sales data should be stated separately for PCs, consoles, and mobile devices;

d.   The sales revenue and unit sales data should separately reflect sales to US purchasers and sales to purchasers in the rest of the world;

e.   The sales revenue and unit sales data should include, separately and for each company, sales of Software by all parent companies or companies you acquired, operated, or in which you had a business interest from January 1, 2003 to the present;

f.   State, by month, whether the sales revenue data produced in response to this Request reflect wholesale prices, retail prices (i.e., consumer prices), or some other measure. To the extent possible, please provide retail prices in responding to this Request; and

g.   The sales revenue data should be net sales (gross sales less returns, less chargebacks from credit card companies, payment processors or others, less sales tax, and less value-added tax).

**RESPONSE TO REQUEST NO. 1:**  Nexon objects to this request on the grounds that it is temporally overbroad.  The request seeks production of documents over a 20-year period. The Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing

2

OBJECTIONS TO SUBPOENA

information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.

Nexon objects to this request on the grounds that it is geographically overbroad because it seeks to compel production of documents throughout the entire world and requires production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand."  *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77).  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."

Nexon objects to the Request as being overbroad in scope and seeking information about nearly every sale made by Nexon over the past two decades.  The Subpoena includes the following definitions:

> "DLC" and "downloadable content" mean supplemental content for a released game, distributed through the Internet, including through a distribution platform, by the game's publisher, developer, or another entity.

> "Game" means, without limitation, video games designed for operation, locally or while connected to a server, streaming media, or other electronic service, on personal computers, consoles, smartphones, or other electronic computing devices, whether in individual or multiplayer modes, and whether distributed over distribution platforms, by retail stores, online resellers, or by other means.

> "Software" means games, DLC, and in-game purchases.

Nexon is a leading video game publisher, and as such, this Request when read in connection with the above-quoted definitions encompasses nearly every sale completed by Nexon over the past

3

EXHIBIT B
063

1   two decades.  The burden imposed by this Request is disproportionate to any need for the

2   information.

3       Nexon objects to this request on the grounds that it seeks to compel production of highly-

4   confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that

5   the Court must quash a subpoena that requires "disclosing a trade secret or other confidential

6   research, development, or commercial information."  As set forth above, this Request seeks to

7   compel production of detailed financial records related to every game sold by Nexon over the past

8   two decades. Courts have found that requiring a competitor to divulge its financial records may

9   cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-

10  KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse

11  interest, allowing him access to defendant's bank records (identities of clients) would be highly

12  prejudicial.")

13      Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P.

14

15      Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P.

16  45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena

17  must take reasonable steps to avoid imposing undue burden or expense on a person subject to the

18  subpoena."  For the reasons stated above, the party or attorney responsible for issuing the

19  Subpoena in general, and this Request in particular, have failed to take reasonable steps to avoid

20  imposing undue burden or expense on Nexon.

21

22      Nexon objects to the Subpoena and this Request to the extent that it fails to comply with

23  the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve, Inc. ("Valve") failed to

24  provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

25

26

27

28

4

EXHIBIT B
064

**REQUEST NO. 2:**    Documents sufficient to show for each month from January 1, 2003 to the present, your total sales revenues and units sold for Software for PCs, consoles, and mobile devices. For purposes of responding to this Request,

    a.   The revenue you received or retained for Software not distributed through any Nexon distribution platform, including without limitation for Software offered on distribution platforms other than any Nexon distribution platform and Software sold in wholesale transactions for resale by others;

    b.   The revenue share (sometimes referred to as the "commission") you received for Software published by others and distributed through any Nexon distribution platform; and

    c.   The revenue you retained, net of payments to others, for Software published by you and distributed through any Nexon distribution platform.

**RESPONSE TO REQUEST NO. 2:**    Nexon objects to this request on the grounds that it is temporally overbroad. The request seeks production of documents over a 20-year period.  The Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.

Nexon objects to the Request as being overbroad in scope and seeking information about nearly every sale made by Nexon over the past two decades.  The Subpoena includes the following definitions:

"DLC" and "downloadable content" mean supplemental content for a released game, distributed through the Internet, including through a distribution platform, by the game's publisher, developer, or another entity.

"Game" means, without limitation, video games designed for operation, locally or while connected to a server, streaming media, or other electronic service, on personal computers, consoles, smartphones, or other electronic computing devices, whether in individual or

5

EXHIBIT B
065

multiplayer modes, and whether distributed over distribution platforms, by retail stores, online resellers, or by other means.

"Software" means games, DLC, and in-game purchases.

Nexon is a leading video game publisher, and as such, this Request when read in connection with the above-quoted definitions encompasses nearly every sale completed by Nexon over the past two decades.  The burden imposed by this Request is disproportionate to any need for the information.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  As set forth above, this Request seeks to compel production of detailed financial records related to every game sold by Nexon over the past two decades.  Courts have found that requiring a competitor to divulge its financial records may cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse interest, allowing him access to defendant's bank records (identities of clients) would be highly prejudicial.")

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

OBJECTIONS TO SUBPOENA

EXHIBIT B
066

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 3:**    Documents sufficient to show, for each month from January 1, 2003 to the present for which you produce total sales revenue and unit sales data in response to Request no. 1, the percentage of reported total sales revenues and units attributable to sales in physical packaging and to digital distribution of Software designed for operation on consoles.

**RESPONSE TO REQUEST NO. 3:**  This Request is explicitly based on Request No. 1, and as such, Nexon incorporates by reference each and every objection set forth above in response to Request No. 1.

**REQUEST NO. 4:**    Documents sufficient to show, for each month from January 1, 2003 to the present for which you produce total sales revenue and unit sales data in response to Request no. 1, the percentage of reported total sales revenues and units attributable to sales in physical packaging and to digital distribution of Software designed for operation on PCs.

**RESPONSE TO REQUEST NO. 4:**  This Request is explicitly based on Request No. 1, and as such, Nexon incorporates by reference each and every objection set forth above in response to Request No. 1.

**REQUEST NO. 5:**    Documents sufficient to show the proportion of total sales revenues and units ·sold, described in the documents produced in response to Request no. 1, that were attributable to physical packaging of Software that contained codes or keys to enable downloading of the software in contrast to physical packaging that contained digital media, e.g., CDs or DVDs.

7

EXHIBIT B
067

**RESPONSE TO REQUEST NO. 5:**  This Request is explicitly based on Request No. 1, and as such, Nexon incorporates by reference each and every objection set forth above in response to Request No. 1.

**REQUEST NO. 6:**     Documents sufficient to show how, rather than providing digital media inside physical packaging, the provision of codes or keys for downloading and activation of games in physical packaging affected the revenues, costs, and margins of the Software sold by you.

**RESPONSE TO REQUEST NO. 6:**     Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request.  To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.  To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of

EXHIBIT B
068

establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  As set forth above, this Request seeks to compel production of detailed financial records related to every game sold by Nexon over the past two decades.  Courts have found that requiring a competitor to divulge its financial records may cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse interest, allowing him access to defendant's bank records (identities of clients) would be highly prejudicial.")

9

EXHIBIT B
069

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 7:**   Documents sufficient to show how, rather than providing digital media inside physical packaging, the online distribution of codes or keys for downloading and activation of games affected the revenues, costs, and margins of the Software sold by you.

**RESPONSE TO REQUEST NO. 7:**  Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request.  To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.  To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of*

10

EXHIBIT B
070

*Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77).  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  As set forth above, this Request seeks to compel production of detailed financial records related to every game sold by Nexon over the past two decades.  Courts have found that requiring a competitor to divulge its financial records may cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse interest, allowing him access to defendant's bank records (identities of clients) would be highly prejudicial.")

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

11

OBJECTIONS TO SUBPOENA

EXHIBIT B
071

1

2      **REQUEST NO. 8:**     Documents sufficient to show how the provision, at no charge to

3  publishers, of codes or keys for downloading and activation of games affected the revenues, costs,

4  and margins of the Software sold by you.

5      **RESPONSE TO REQUEST NO. 8:** Nexon objects to this request on the grounds that it

6

7  is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this

8  Request.  To the extent that this Request covers the same period of time covered by the preceding

9  requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for

10  this extraordinarily long period of time.  Accessing information dating back 20 years constitutes

11  an undue burden that is disproportional to any need for such information.  To the extent that this

12  Request seeks information from some other period of time, this Request is vague and ambiguous

13  because no period of time is specified.

14

15      Nexon objects to this request on the grounds that it is either geographically overbroad, or it

16  is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that

17  this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this

18  Request is overbroad.  To the extent that this Request covers the entire world, this Request

19  purports to require production of documents that are not in the possession or control of Nexon.  In

20  the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand."  *In re*

21  *Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International*

22  *Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of

23

24  establishing control over the documents sought is on the party seeking production. *Int'l Union of*

25  *Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al.,

26  MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77).  The subpoena fails to allege—much less

27  establish—that Nexon has "control" over the documents held by its "parent companies."  To the

28

12

EXHIBIT B
072

extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  As set forth above, this Request seeks to compel production of detailed financial records related to every game sold by Nexon over the past two decades.  Courts have found that requiring a competitor to divulge its financial records may cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse interest, allowing him access to defendant's bank records (identities of clients) would be highly prejudicial.")

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 9:**     Documents sufficient to determine, separately by total unit sales and total sales revenues, the top five resellers to which you distributed Software in physical

13

EXHIBIT B
073

packaging, and the corresponding total unit sales and total sales revenues for each reseller so identified.

**RESPONSE TO REQUEST NO. 9:**    Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request.  To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.  To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

Nexon objects to this request on the grounds that it is either geographically overbroad or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., Moore's Federal Practice, § 34.14[2][b], at 34-77). The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

14

EXHIBIT B
074

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  As set forth above, this Request seeks to compel production of detailed financial records related to every game sold by Nexon over the past two decades.  Courts have found that requiring a competitor to divulge its financial records may cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse interest, allowing him access to defendant's bank records (identities of clients) would be highly prejudicial.")

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 10:**   Documents sufficient to determine, separately by total unit sales and total sales revenues, the top five resellers to which you distributed Software for digital download, and the corresponding total unit sales and total sales revenues for each reseller so identified.

15

**RESPONSE TO REQUEST NO. 10:**   Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request.  To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.  To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

Nexon objects to this request on the grounds that it is either geographically overbroad or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that

OBJECTIONS TO SUBPOENA

EXHIBIT B
076

the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  As set forth above, this Request seeks to compel production of detailed financial records related to every game sold by Nexon over the past two decades.  Courts have found that requiring a competitor to divulge its financial records may cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse interest, allowing him access to defendant's bank records (identities of clients) would be highly prejudicial.")

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 11:**   Documents sufficient to show for each month from January 1, 2003 to the present, the average amount of the total sales revenue that was received by developers of Software for which you acted as a publisher. For purposes of this Request, "developers" refers to persons who are not your employees or agents, and includes entities that are separately organized from you and not divisions or business units otherwise under your control.

17

OBJECTIONS TO SUBPOENA

**RESPONSE TO REQUEST NO. 11:**   Nexon objects to this request on the grounds that it is temporally overbroad. The request seeks production of documents over a 20-year period.  The Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77). The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  As set forth above, this Request seeks to compel production of detailed financial records related to every game sold by Nexon over the past

OBJECTIONS TO SUBPOENA

two decades.  Courts have found that requiring a competitor to divulge its financial records may cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse interest, allowing him access to defendant's bank records (identities of clients) would be highly prejudicial.")

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 12:**   Documents sufficient to show, from January 1, 2003 to the present, what companies and products you regard as included in the markets that include distribution of games.

**RESPONSE TO REQUEST NO. 12:**   Nexon objects to this request on the grounds that it is temporally overbroad. The request seeks production of documents over a 20-year period.  The Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.

19

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  Nexon's assessment of its competitors and competitive products is highly-confidential and sensitive competitive information.

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the

20

OBJECTIONS TO SUBPOENA

subpoena." For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4). Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 13:**   Documents sufficient to show, from January 1, 2003 to the present, whether you regard Valve as a competitor to Nexon in sales of games, and whether you regard Steam as a competitor to any Nexon distribution platform.

**RESPONSE TO REQUEST NO. 13:**   Nexon objects to this request on the grounds that it is temporally overbroad. The request seeks production of documents over a 20-year period. The Subpoena fails to provide any basis for this extraordinarily long period of time. Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4). Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

OBJECTIONS TO SUBPOENA

EXHIBIT B
081

1

2      **REQUEST NO. 14:**   All documents, from January 1, 2003 to the present, that list,

3   compare, count, analyze, or describe one or more features of any Nexon distribution platform and

4   Steam.

5      **RESPONSE TO REQUEST NO. 14:**   Nexon objects to this request on the grounds that it

6

7   is temporally overbroad. The request seeks production of documents over a 20-year period.  The

8   Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing

9   information dating back 20 years constitutes an undue burden that is disproportional to any need

10   for such information.

11      Nexon objects to this request on the grounds that it seeks to compel production of highly-

12   confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that

13   the Court must quash a subpoena that requires "disclosing a trade secret or other confidential

14   research, development, or commercial information."  Nexon's assessment of its competitors,

15   competitive products, and features is highly-confidential and sensitive competitive information.

16

17      Nexon objects to this request on the grounds that it purports to require production of "all

18   documents," regardless of whether such documents are redundant or irrelevant to any issues in

19   dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by

20   the extraordinarily long period of time encompassed by this Request.

21

22      Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P.

23   45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena

24   must take reasonable steps to avoid imposing undue burden or expense on a person subject to the

25   subpoena."  For the reasons stated above, the party or attorney responsible for issuing the

26   Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid

27   imposing undue burden or expense on Nexon.

28

OBJECTIONS TO SUBPOENA

EXHIBIT B
082

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 15:**   All documents, from January 1, 2003 to the present, that discuss your potential or actual adoption, on any Nexon distribution platform, of a feature of Steam or one similar to a feature of Steam.

**RESPONSE TO REQUEST NO. 15:**  Nexon objects to this request on the grounds that it is temporally overbroad. The request seeks production of documents over a 20-year period.  The Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  Nexon's assessment of its competitors and competitive products and features is highly-confidential and sensitive competitive information.

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the

23

EXHIBIT B
083

subpoena."  For the reasons stated above, the party or attorney responsible for issuing the

Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid

imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with

the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any

information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 16:**    All documents, from January 1, 2003 to the present, that calculate,

discuss, compare, or describe the market share held by Nexon or Steam.

**RESPONSE TO REQUEST NO. 16:**  Nexon objects to this request on the grounds that it

is temporally overbroad. The request seeks production of documents over a 20-year period.  The

Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing

information dating back 20 years constitutes an undue burden that is disproportional to any need

for such information.

Nexon objects to this request on the grounds that it seeks to compel production of highly-

confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that

the Court must quash a subpoena that requires "disclosing a trade secret or other confidential

research, development, or commercial information."  Nexon's assessment of its market share and

the market share of its competitors is highly-confidential and sensitive competitive information.

Nexon objects to this request on the grounds that it purports to require production of "all

documents," regardless of whether such documents are redundant or irrelevant to any issues in

dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by

the extraordinarily long period of time encompassed by this Request.

OBJECTIONS TO SUBPOENA

EXHIBIT B
084

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4). Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 17:**   All documents, from January 1, 2003 to the present, that describe, report, or calculate the cost of (a) developing any Nexon distribution platform, (b) individual features you have added to any Nexon distribution platform since its launch, or (c) the profit margin you realized on Nexon distribution platforms each year since its launch.

**RESPONSE TO REQUEST NO. 17:**   Nexon objects to this request on the grounds that it is temporally overbroad. The request seeks production of documents over a 20-year period. The Subpoena fails to provide any basis for this extraordinarily long period of time. Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request. To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad. To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon. In

the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to the Request as being overbroad in scope and seeking information about nearly every sale made by Nexon over the past two decades.  The burden imposed by this Request is disproportionate to any need for the information.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  As set forth above, this Request seeks to compel production of detailed financial records related to nearly every sale by Nexon over the past two decades.  Courts have found that requiring a competitor to divulge its financial records may cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse interest, allowing him access to defendant's bank records (identities of clients) would be highly prejudicial.")

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in

26

1  dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by

2  the extraordinarily long period of time encompassed by this Request.

3         Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P.

4  45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena

5  must take reasonable steps to avoid imposing undue burden or expense on a person subject to the

6  subpoena."  For the reasons stated above, the party or attorney responsible for issuing the

7  Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid

8  imposing undue burden or expense on Nexon.

9         Nexon objects to the Subpoena and this Request to the extent that it fails to comply with

10 the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve, Inc. ("Valve") failed to

11 provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

12

13

14

15 **REQUEST NO. 18:**   All documents discussing, describing, or analyzing competition in

16 the market or markets that include distribution of games, including all such documents you

17 produced in discovery or otherwise in *In re: Google Play Store Antitrust Litig.*, No. 3:21-md-

18 02981-JD (N.D. Cal.) or *Epic Games, Inc. v. Apple Inc*., No.4:20-cv-05640-YGR (N.D. Cal.).

19 **RESPONSE TO REQUEST NO. 18:**  Nexon objects to this request on the grounds that it

20 is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this

21 Request.  To the extent that this Request covers the same period of time covered by the preceding

22 requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for

23 this extraordinarily long period of time.  Accessing information dating back 20 years constitutes

24 an undue burden that is disproportional to any need for such information.  To the extent that this

25 Request seeks information from some other period of time, this Request is vague and ambiguous

26 because no period of time is specified.

27

28

OBJECTIONS TO SUBPOENA

1    Nexon objects to this request on the grounds that it is either geographically overbroad, or it

2    is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that

3    this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this

4    Request is overbroad.  To the extent that this Request covers the entire world, this Request

5    purports to require production of documents that are not in the possession or control of Nexon.  In

6    the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand."  *In re*

7    *Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International*

8    *Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of

9    establishing control over the documents sought is on the party seeking production. *Int'l Union of*

10   *Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al.,

11   Moore's Federal Practice, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less

12   establish—that Nexon has "control" over the documents held by its "parent companies."  To the

13   extent that this Request seeks information from some other geographic area, this Request is vague

14   and ambiguous because no specific area is specified.

15           Nexon objects to this request on the grounds that it seeks to compel production of highly-

16   confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that

17   the Court must quash a subpoena that requires "disclosing a trade secret or other confidential

18   research, development, or commercial information."  As set forth above, this Request seeks to

19   compel production of detailed financial records related to every game sold by Nexon over the past

20   two decades.  Courts have found that requiring a competitor to divulge its financial records may

21   cause significant prejudice.  *Spitzmesser v. Tate Synder Kimsey Architects, Ltd.*, 2:10-CV-01700-

22   KJD-LRL (D. Nev. Dec. 9, 2011) ("[A]s plaintiff owns a competing business with an adverse

23   interest, allowing him access to defendant's bank records (identities of clients) would be highly

24   prejudicial.")

OBJECTIONS TO SUBPOENA

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

Nexon objects to this request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 19:**   All documents you provided to, or you received from, any state, federal, or international regulator, government entity, lobbyist, trade association, or consultant referring or relating to any investigation or review of antitrust, competition, or consumer protection issues, or proposed or existing regulation involving, Nexon, Steam, or any other developers, publishers, or distributors of Software.

**RESPONSE TO REQUEST NO. 19:**  Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request.  To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes

an undue burden that is disproportional to any need for such information.  To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information." Nexon's assessment of competition in the industry and its competitors is highly-sensitive commercial information.

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in

30

OBJECTIONS TO SUBPOENA

dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

Nexon objects to this Request to the extent that it calls for the production of materials protected by the attorney-client privilege and/or the work product doctrine.

Nexon objects to this Request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 20:**   All documents describing, referring, or relating to any policies or guidelines for pricing of Software on any Nexon distribution platform, including any policies or guidelines for pricing of games on any Nexon distribution platform that are also sold on storefronts operated by

other companies.

**RESPONSE TO REQUEST NO. 20:**  Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request.  To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes

31

OBJECTIONS TO SUBPOENA

an undue burden that is disproportional to any need for such information.  To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information." Nexon's pricing information and strategy is highly-sensitive commercial information.

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in

OBJECTIONS TO SUBPOENA

EXHIBIT B
092

dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

Nexon objects to this Request to the extent that it calls for the production of materials protected by the attorney-client privilege and/or the work product doctrine.

Nexon objects to this Request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 21:**   All documents describing, referring, or relating to your decision to launch any Nexon distribution platform.

**RESPONSE TO REQUEST NO. 21:**  Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request.  To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time.  Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information.  To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

33

EXHIBIT B
093

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information." Nexon's pricing information and strategy is highly-sensitive commercial information.

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

OBJECTIONS TO SUBPOENA

EXHIBIT B
094

Nexon objects to this Request to the extent that it calls for the production of materials protected by the attorney-client privilege and/or the work product doctrine.

Nexon objects to this Request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4). Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 22:**   All documents describing, referring, or relating to the ease, difficulty, expense, or barriers, if any, to creating or maintaining a distribution platform in competition with others.

**RESPONSE TO REQUEST NO. 22:** Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request. To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time. Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information. To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

OBJECTIONS TO SUBPOENA

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77). The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information." Nexon's competitive decisions and strategy is highly-sensitive commercial information.

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

OBJECTIONS TO SUBPOENA

Nexon objects to this Request to the extent that it calls for the production of materials protected by the attorney-client privilege and/or the work product doctrine.

Nexon objects to this Request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4). Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 23:**   All documents relating to the reasons you distributed (or decided not to distribute) games on other stores or distribution platforms, including Steam, instead of or in addition to Nexon distribution platforms, including the reasons you stopped releasing games on Steam or began doing so again (if you ever made such decisions).

**RESPONSE TO REQUEST NO. 23:**   Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request. To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time. Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information. To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

37

OBJECTIONS TO SUBPOENA

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information." Nexon's competitive decisions and strategy is highly-sensitive commercial information.

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

38

EXHIBIT B
098

Nexon objects to this Request to the extent that it calls for the production of materials protected by the attorney-client privilege and/or the work product doctrine.

Nexon objects to this Request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4). Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 24:**   All documents describing, referring, or relating to features and functionality for cross-play between games offered on any Nexon distribution platform and any other platform, including but not limited to Steam.

**RESPONSE TO REQUEST NO. 24:**   Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request. To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time. Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information. To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

39

OBJECTIONS TO SUBPOENA

1    Nexon objects to this request on the grounds that it is either geographically overbroad, or it

2  is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that

3  this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this

4  Request is overbroad.  To the extent that this Request covers the entire world, this Request

5  purports to require production of documents that are not in the possession or control of Nexon.  In

6  the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re*

7  *Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International*

8  *Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of

9  establishing control over the documents sought is on the party seeking production. *Int'l Union of*

10  *Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al.,

11  MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77.  The subpoena fails to allege—much less

12  establish—that Nexon has "control" over the documents held by its "parent companies."  To the

13  extent that this Request seeks information from some other geographic area, this Request is vague

14  and ambiguous because no specific area is specified.

15    Nexon objects to this request on the grounds that it seeks to compel production of highly-

16  confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that

17  the Court must quash a subpoena that requires "disclosing a trade secret or other confidential

18  research, development, or commercial information." Nexon's competitive decisions and strategy is

19  highly-sensitive commercial information.

20    Nexon objects to this request on the grounds that it purports to require production of "all

21  documents," regardless of whether such documents are redundant or irrelevant to any issues in

22  dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by

23  the extraordinarily long period of time encompassed by this Request.

40

Nexon objects to this Request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4). Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 25:** All documents describing, referring, or relating to customers of any Nexon distribution platform who are also customers of Steam, including all documents calculating, estimating, or discussing the numbers of such persons, including at specific times or during specific periods.

**RESPONSE TO REQUEST NO. 25:** Nexon objects to this request on the grounds that it is either temporally overbroad, or it is vague and ambiguous. No time period is specified in this Request. To the extent that this Request covers the same period of time covered by the preceding requests (*i.e.*, 20 years), this Request is overbroad, and the Subpoena fails to provide any basis for this extraordinarily long period of time. Accessing information dating back 20 years constitutes an undue burden that is disproportional to any need for such information. To the extent that this Request seeks information from some other period of time, this Request is vague and ambiguous because no period of time is specified.

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request. To the extent that

this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9ᵗʰ Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., Moore's Federal Practice, § 34.14[2][b], at 34-77).  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it seeks to compel production of highly-confidential information to Nexon's direct competitor.  Fed. R. Civ. P. 45(d)(3)(B)(i) provides that the Court must quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information." The identify of Nexon's customers constitute highly-sensitive commercial information.

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

Nexon objects to this Request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the

42

EXHIBIT B
102

subpoena."  For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 26:**   All documents describing, referring, or relating to *In re Valve Antitrust Litigation*, No. 2:2 l-cv-00563-JCC (W.D. Wash.) or the lawsuits filed by Wolfire Games, LLC, Dark Catt Studios Holdings, Inc., and Dark Catt Studios Interactive LLC consolidated therein.

**RESPONSE TO REQUEST NO. 26:**

Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand."  *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77). The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the

43

extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in dispute. The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

Nexon objects to this request on the grounds that the documents sought are available from parties to this lawsuit. Obtaining responsible documents is more efficient and economical than demanding production from Nexon.

Nexon objects to this Request on the grounds that it fails to comply with Fed. R. Civ. P. 45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." For the reasons stated above, the party or attorney responsible for issuing the Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon.

Nexon objects to the Subpoena and this Request to the extent that it fails to comply with the notice requirement of Fed. R. Civ. P. 45(a)(4). Counsel for Valve failed to provide any information showing compliance with Fed. R. Civ. P. 45(a)(4).

**REQUEST NO. 27:**   All documents and communications between you, or anyone employed by or representing you, and any employee or representative of, or attorney representing, Wolfire Games, LLC, Dark Catt Studios Holdings, Inc., or Dark Catt Studios Interactive LLC, including without limitation all documents and communications referring or relating to In re Valve Antitrust Litigation, No. 2:21-cv-00563-JCC (W.D. Wash.) or the lawsuits filed by Wolfire

OBJECTIONS TO SUBPOENA

EXHIBIT B
104

Games, LLC, Dark Catt Studios Holdings, Inc., and Dark Catt Studios Interactive LLC consolidated therein, or the subject matter or allegations of these lawsuits.

**RESPONSE TO REQUEST NO. 27:**   Nexon objects to this request on the grounds that it is either geographically overbroad, or it is vague and ambiguous. No geographic limitation is present in this Request.  To the extent that this request covers the same geographic scope (*i.e.*, the entire world) as preceding requests, this Request is overbroad.  To the extent that this Request covers the entire world, this Request purports to require production of documents that are not in the possession or control of Nexon.  In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litigation*, 191 F. 3d 1090, 1107 (9th Cir. 1989) (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  The burden of establishing control over the documents sought is on the party seeking production. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 (9th Cir. 1989); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 34.14[2][b], at 34-77).  The subpoena fails to allege—much less establish—that Nexon has "control" over the documents held by its "parent companies."  To the extent that this Request seeks information from some other geographic area, this Request is vague and ambiguous because no specific area is specified.

Nexon objects to this request on the grounds that it purports to require production of "all documents," regardless of whether such documents are redundant or irrelevant to any issues in dispute.  The burden of complying with the exhaustive language of this Request is exacerbated by the extraordinarily long period of time encompassed by this Request.

Nexon objects to this request on the grounds that the documents sought are available from parties to this lawsuit.  Obtaining responsible documents is more efficient and economical than demanding production from Nexon.

45

1    Nexon objects to this Request on the grounds that it fails to comply with Fed. R. Civ. P.

2    45(d)(1), which provides: "[a] party or attorney responsible for issuing and serving a subpoena

3    must take reasonable steps to avoid imposing undue burden or expense on a person subject to the

4    subpoena."  For the reasons stated above, the party or attorney responsible for issuing the

5    Subpoena in general, and this Request in particular have failed to take reasonable steps to avoid

6

7    imposing undue burden or expense on Nexon.

8    Nexon objects to the Subpoena and this Request to the extent that it fails to comply with

9    the notice requirement of Fed. R. Civ. P. 45(a)(4).  Counsel for Valve failed to provide any

10   information showing compliance with Fed. R. Civ. P. 45(a)(4).

11

12   Date: February 6, 2023                    PCFB, LLC

13

14                                             /s/ Jared L. Cherry
                                               Jared L. Cherry
15                                             Counsel for Plaintiffs Nexon America Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B
106

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 6, 2023, I mailed sent the foregoing document via **FIRST CLASS MAIL** and **VIA EMAIL** to:

Meeghan Tirtasaputra (mtirtasaputra@foxrothschild.com)
Fox Rothschild LLP
10250 Constellation Boulevard, Suite 900
Los Angeles, CA 90067

Peter Breslauer (pbreslauer@rnrnwr.com)
Montgomery McCracken
1735 Market Street
Philadelphia, PA 19103-7505

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on February 6, 2023, at Salt Lake City, Utah.

/s/ Jared L. Cherry

OBJECTIONS TO SUBPOENA

EXHIBIT B
107

# EXHIBIT C

EXHIBIT C
108



**Jared L. Cherry**
*Phone* 801-935-4932
jared@pcfblaw.com

February 6, 2023

**VIA EMAIL (pbreslauer@mmwr.com)**

Peter Breslauer
Montgomery McCracken Walker & Rhoades LLP
1735 Market Stret
Philadelphia PA 19103-7505

**VIA EMAIL (mtirtasaputra@foxrothschild.com)**

Meeghan Tirtasaputra
Fox Rothschild LLP
10250 Constellation Boulevard, Suite 900
Los Angeles, CA 90067

> Re:   *In re Valve Antitrust Litigation*, No. 2:21-cv-00563-JCC (W.D. Wash)
>        Subpoena to Nexon America Inc.

Mr. Breslauer:

Nexon America Inc. ("Nexon") has asked me to respond to your letter and subpoena dated January 20, 2023. Please direct all correspondence related to this matter to my attention.

The subpoena is overbroad, imposes an undue burden on Nexon, and purports to require disclosure of highly confidential information to a direct competitor. More specifically, the subpoena seeks production of documents from a 20-year period of time and seeks production from Nexon's parent companies. The temporal and geographic scope is manifestly unreasonable.

Fed. R. Civ. P. 45(d)(1) provides "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." You have failed to take reasonable steps to avoid imposing undue burden or expense on Nexon. In addition, I note that when faced with a similarly broad subpoena, Valve argued that requests for production of confidential records related to Valve's revenues over a period of six years was unreasonable. *Epic Games, Inc. v. Apple, Inc.* Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal. Feb. 18, 2021), Doc. 346, at pages 5-7. Under the same logic advanced by Valve when it suited its own interest, Valve's requests are unreasonable.

Nexon's specific objections to each request are stated in the enclosed response. None of the requests included in the subpoena satisfy the requirements of Fed. R. Civ. P. 45. If you fail or refuse to confirm in writing your agreement to unconditionally withdraw the subpoena by **February 13,**

EXHIBIT C
109

February 6, 2023
Page 2 of 2

**2023**, Nexon will have no choice but to file a motion to quash the subpoena and to seek appropriate remedies under Fed. R. Civ. P. 45(d)(1).

Sincerely,

Jared L. Cherry

Enclosure:      Nexon's Objections to Subpoena

---

PCFB – ATTORNEYS AT LAW

EXHIBIT C
110

# EXHIBIT D

[This is an English translation prepared for the convenience of non-resident shareholders. Should there be any inconsistency between the translation and the official Japanese text, the latter shall prevail. The Company assumes no responsibility for this translation or for direct, indirect or any other forms of damages arising from the translations.]



# Consolidated Financial Results
## for the Fiscal Year Ended December 31, 2022
## [IFRS]

February 9, 2023

Company name: NEXON Co., Ltd.

Stock exchange listing: Tokyo Stock Exchange

Stock code: 3659

URL: https://ir.nexon.co.jp/en/

Representative: Owen Mahoney, Representative Director, President and Chief Executive Officer

Contact: Shiro Uemura, Representative Director and Chief Financial Officer                    Phone: +81-3-6629-5318

Scheduled date of Ordinary General Meeting of Shareholders: March 24, 2023

Scheduled date of filing annual securities reports: March 27, 2023

Scheduled date of dividend payment commencement: March 27, 2023

Supplementary briefing material on financial results: Yes

Financial results briefing: No

(Amounts are rounded to nearest million yen)

1. Consolidated Financial Results for the Fiscal Year Ended December 31, 2022
   (From January 1, 2022 to December 31, 2022)
   (1) Consolidated Operating Results                                      (% changes from the previous fiscal year)

(Millions of yen)

|  | Revenue | | Operating income | | Income before income taxes | | Net income | | Net income attributable to owners of the parent company | | Total comprehensive income | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY 2022 | 353,714 | 28.9% | 103,696 | 13.3% | 140,525 | 3.7% | 99,990 | (11.6)% | 100,339 | (12.7)% | 114,732 | (12.6)% |
| FY 2021 | 274,462 | (6.3)% | 91,541 | (17.9)% | 135,472 | 25.2% | 113,066 | 103.8% | 114,888 | 104.4% | 131,280 | 51.9% |

|  | Basic earnings per share | Diluted earnings per share | Ratio of net income to equity attributable to owners of the parent company | Ratio of income before income taxes to total assets | Ratio of operating income to revenue |
|---|---|---|---|---|---|
|  | Yen | Yen | % | % | % |
| FY 2022 | 114.74 | 113.81 | 11.8 | 13.8 | 29.3 |
| FY 2021 | 128.91 | 126.55 | 14.9 | 14.7 | 33.4 |

(Reference): Share of profit (loss) of investments accounted for using equity method
           FY2022: ¥(10,246) million, FY2021: ¥(999) million

(2)   Consolidated Financial Position

|  | Total assets | Total equity | Total equity attributable to owners of the parent company | Ratio of equity attributable to owners of the parent company | Equity attributable to owners of the parent company per share |
|---|---|---|---|---|---|
|  | Millions of yen | Millions of yen | Millions of yen | % | Yen |
| As of December 31, 2022 | 1,042,849 | 867,546 | 858,193 | 82.3 | 996.95 |
| As of December 31, 2021 | 986,632 | 845,893 | 836,668 | 84.8 | 939.19 |

(3)   Consolidated Cash Flows

(Millions of yen)

|  | From operating activities | From investing activities | From financing activities | Cash and cash equivalents at end of year |
|---|---|---|---|---|
| FY 2022 | 130,144 | (10,918) | (105,859) | 409,368 |
| FY 2021 | 105,914 | 18,084 | (21,053) | 365,239 |

2.   Dividends

| | Annual Dividends | | | | | Total amount of cash dividends (annual) | Dividends payout ratio (consolidated) | Ratio of total amount of dividends to equity attributable to owners of the parent company (consolidated) |
|---|---|---|---|---|---|---|---|---|
| | End of 1st Quarter | End of 2nd Quarter | End of 3rd Quarter | End of Year | Total | | | |
| | Yen | Yen | Yen | Yen | Yen | Millions of yen | % | % |
| FY 2021 | — | 2.50 | — | 5.00 | 7.50 | 6,682 | 5.8 | 0.9 |
| FY 2022 | — | 5.00 | — | 5.00 | 10.00 | 8,635 | 8.7 | 1.0 |
| FY 2023 (Forecast) | — | 5.00 | — | 5.00 | 10.00 | | — | |

3.   Consolidated Financial Results Forecast for the First Quarter of Fiscal Year Ending December 31, 2023
(From January 1, 2023 to March 31, 2023)

(% changes from the previous corresponding period)

(Millions of yen)

|  | Revenue | | Operating income | | Income before income taxes | | Net income | | Net income attributable to owners of the parent company | | Basic earnings per share |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | | | | | | | | | | | Yen |
| First Quarter | 116,708 | 28.2% | 45,321 | 17.7% | 46,987 | (17.9)% | 34,267 | (14.6)% | 34,354 | (14.7)% | 40.02 |
| | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| | 125,635 | 38.0% | 52,502 | 36.3% | 54,168 | (5.3)% | 39,810 | (0.8)% | 39,787 | (1.2)% | 46.35 |

(Note) For the forecasts of consolidated financial results for the fiscal year ending December 31, 2023, it is difficult to reasonably estimate financial results for the first six months ending June 30, 2023 and the fiscal year ending December 31, 2023 at the moment, and accordingly, only the financial results forecast for the first three months of the fiscal year ending December 31, 2023 is disclosed. Also, as it is difficult to estimate specific figures, disclosure is made with a range. For details, please refer to "1. Overview of Operating Results and Financial Position (3) Qualitative Information on Consolidated Financial Results Forecast" on page 6 of the Appendix.

*(Notes)
(1) Changes in Significant Subsidiaries during the Period : No
   (Changes in specified subsidiaries accompanying changes in scope of consolidation)

(2) Changes in accounting policies and changes in accounting estimates
   1) Changes in accounting policies required by IFRS:                    Yes
   2) Changes in accounting policies other than 1) above:                 No
   3) Changes in accounting estimates:                                     No

(3) Number of shares issued and outstanding (common stock)
   1) Total number of shares issued at the end of the period (including treasury stock):
      As of December 31, 2022:                  866,773,728  shares
      As of December 31, 2021:                  898,746,469  shares
   2) Total number of treasury stock at the end of the period:
      As of December 31, 2022:                  5,955,400  shares
      As of December 31, 2021:                  7,908,437  shares
   3) Average number of shares during the period:
      For the fiscal year ended December 31, 2022: 874,516,449  shares
      For the fiscal year ended December 31, 2021: 891,231,822  shares
   (Note) "Total number of treasury stock at the end of the period" includes Nexon's stock held by our consolidated
      subsidiary, Stiftelsen Embark Incentive  (as of December 31, 2022: 787,023 shares; as of December 31,
      2021: 865,770 share). The number of treasury stock deducted in the calculation of the average number of
      shares during the period includes Nexon's stock held by the consolidated subsidiary (as of December 31,
      2022: 847,598 shares; as of December 31, 2021: 336,017 shares).

(Reference) Overview of Non-consolidated Financial Results

1. Non-consolidated Financial Results for the Fiscal Year Ended December 31, 2022
   (From January 1, 2022 to December 31, 2022)

(1) Non-consolidated Operating Results                            (% changes from the previous fiscal year)

(Millions of yen)

|  | Revenue | | Operating income | | Ordinary income | | Net income | |
|---|---|---|---|---|---|---|---|---|
| FY 2022 | 5,872 | (0.4)% | (10,378) | — | 72,787 | (13.5)% | 73,481 | (6.6)% |
| FY 2021 | 5,898 | 9.0% | (8,411) | — | 84,163 | 110.7% | 78,667 | 111.7% |

|  | Basic earnings per share | Diluted earnings per share |
|---|---|---|
|  | Yen | Yen |
| FY 2022 | 83.94 | 83.35 |
| FY 2021 | 88.23 | 87.16 |

(2) Non-consolidated Financial Position

(Millions of yen)

|  | Total assets | Net assets | Equity ratio | Net assets per share |
|---|---|---|---|---|
| As of December 31, 2022 | 171,073 | 165,910 | 87.6% | 174.00 yen |
| As of December 31, 2021 | 189,677 | 184,833 | 91.8% | 195.23 yen |

(Reference): Equity at December 31, 2022: ¥ 149,916 million, Equity at December 31, 2021: ¥174,084 million
(Notes) Non-consolidated financial data is based on Japanese GAAP.

EXHIBIT D
114

\*This financial report is outside the scope of audit procedures.

\*Explanation of the Proper Use of Financial Results Forecasts and Other Notes

(Caution Concerning Forward-Looking Statements)

The forward-looking statements including the financial results forecast herein are based on the information available to the Company and certain assumptions that can be deemed reasonable at time of publication of this document, and are not intended as the Company's commitment to achieve such forecasts. Actual results may differ significantly from these forecasts due to various factors. For conditions prerequisite to the financial results forecast and the points to be noted in the use thereof, please refer to "1. Overview of Operating Results and Financial Position (3) Qualitative Information on Consolidated Financial Results Forecast" on page 6 of the Appendix.

(Method of Obtaining Supplementary Briefing Material on Financial Results)

The supplementary briefing materials on financial results are available on the Company's website.

Contents of Appendix

| | | |
|---|---|---|
| 1. | Overview of Operating Results and Financial Position ……………………………………………… | 2 |
| | (1) | Overview of Operating Results ……………………………………………………………… | 2 |
| | (2) | Overview of Financial Position …………………………………………………………… | 4 |
| | (3) | Qualitative Information on Consolidated Financial Results Forecast ……………………………… | 6 |
| | (4) | Basic Policy on the Distribution of Profits and Dividends for the Current and Next Fiscal Year ……… | 7 |
| 2. | Current Status of the Corporate Group ………………………………………………………… | 8 |
| 3. | Basic Concept for Selection of the Accounting Standards ………………………………………… | 12 |
| 4. | Consolidated Financial Statements and Major Notes ……………………………………………… | 13 |
| | (1) | Consolidated Statement of Financial Position …………………………………………… | 13 |
| | (2) | Consolidated Income Statement …………………………………………………………… | 15 |
| | (3) | Consolidated Statement of Comprehensive Income …………………………………………… | 16 |
| | (4) | Consolidated Statement of Changes in Equity ………………………………………………… | 17 |
| | (5) | Consolidated Statement of Cash Flows ……………………………………………………… | 18 |
| | (6) | Notes to Consolidated Financial Statements ………………………………………………… | 20 |
| | | (Notes on Going Concern Assumption) …………………………………………………… | 20 |
| | | (Changes in Significant Subsidiaries during the Period)……………………………………… | 20 |
| | | (Changes in Accounting Policies and Changes in Accounting Estimates) ……………………… | 20 |
| | | (Changes in Presentation Method)………………………………………………………… | 20 |
| | | (Notes on Significant Changes in the Amount of Equity Attributable to Owners of the Parent Company) | 21 |
| | | (Segment Information) ……………………………………………………………………… | 23 |
| | | (Per Share Information) …………………………………………………………………… | 28 |
| | | (Significant Subsequent Event) …………………………………………………………… | 28 |

EXHIBIT D
116

1.    Overview of Operating Results and Financial Position

(1)    Overview of Operating Results

As for the global economy during the fiscal year ended December 31, 2022, while recovery was seen mainly in developed countries, the global situation remained uncertain primarily due to the impact of the unpredictable COVID-19 situation, the tightening of monetary policy in the U.S. to keep inflation under control, and slowdown of economic activities in China under its zero-COVID policy. In Japan, while economic recovery was seen as restrictions established as measures against COVID-19 were gradually relaxed, the pace of the recovery continued to be unpredictable mainly due to the prolonged conflict in Ukraine and inflation associated with the rapid depreciation of the Japanese yen.

Under these circumstances, although the situation varies slightly depending on the region, Nexon Group has continued to operate its PC online and mobile businesses without its overall business being largely affected, endeavoring to provide players with an enjoyable game experience by developing high-quality games, acquiring more contents, servicing new titles, and updating existing titles. Specifically, we have established the following as Nexon's Focus Strategy: (i) focusing on massive multiplayer online games, (ii) enabling our service to be played across multiple platforms including PC, console and mobile, (iii) leveraging Nexon's IPs, and (iv) investing in new IPs that we think are really special. We have also worked on initiatives for the growth of our global business.

For the fiscal year ended December 31, 2022, Nexon achieved record-breaking full-year revenue driven by the growth of existing titles and contributions from new titles based on our strength in live operations.

In Korea, both PC online and mobile businesses grew year-over-year. For PC online, *EA SPORTS™ FIFA ONLINE 4* significantly grew and achieved record-breaking full-year revenue four years in a row. From Q2, *MapleStory* saw a turnaround from the decreases in its active users and revenue in FY2021 and grew year-over-year. As for mobile, revenue significantly increased year-over-year driven by the contributions from *Dungeon&Fighter Mobile* and *HIT2*, as well as growth of *Blue Archive*, *EA SPORTS™ FIFA ONLINE 4 M* and *EA SPORTS™ FIFA MOBILE*, despite decreases in *V4* and *The Kingdom of the Winds: Yeon*. As a result, we achieved record-breaking overall full-year revenue in Korea.

In China, revenue increased year-over-year driven by an increase in revenue from our major PC title, *Dungeon&Fighter*. *Dungeon&Fighter* had experienced revenue decreases over the past few years, but in FY2022, we adjusted the game to be more user friendly, expanded its contents and events, and promoted communication with the players. As a result, its revenue increased year-over-year.

In Japan, revenue was roughly flat year-over-year due to declines in revenues from *TRAHA* and *V4*, which offset *Blue Archive*'s and *MapleStory*'s growth.

In North America and Europe, revenue increased year-over-year due to favorable foreign exchange rates. However, excluding the impact of the exchange rates, revenue slightly decreased due to *Blue Archive*'s growth and contributions from new games being offset by a decline in revenue from *Choices: Stories You Play*.

In other regions ("Rest of World"), revenue increased year-over-year driven by the growth of *MapleStory*, *MapleStory M* and *Blue Archive*, as well as contributions from new games.

In terms of expenses, cost of sales increased year-over-year due to increased HR costs due to headcount increase, annual salary hike and an increase in bonuses, increased royalty costs for *EA SPORTS™ FIFA ONLINE 4*, and increased server costs due to growth of mobile titles including *Dungeon&Fighter Mobile*. Selling, general and administrative expenses increased year-over-year due to increased platform costs for mobile games, increased marketing costs primarily for promotions of new game launches, and increased HR costs due to headcount increase, annual salary hike and an increase in bonuses.

Finance income increased year-over-year due to a larger foreign exchange gain than that in FY2021 primarily on foreign currency-denominated cash deposits. Loss on revaluation of investments in crypto-assets made through an

exchange due to a change in the market environment, and share of loss of investments accounted for using equity method recorded in accordance with the business performances of equity method affiliates, increased year-over-year. Income taxes expense increased year-over-year due to a comparison with FY2021 when income taxes expense was at a low level due to additional recognition of deferred tax assets on the deferred foreign tax credit of our overseas subsidiary, as well as a year-over-year increase in income before income taxes.

As a result, for the fiscal year ended December 31, 2022, Nexon Group recorded revenue of ¥353,714 million (up 28.9% year-over-year), operating income of ¥103,696 million (up 13.3% year-over-year), income before income taxes of ¥140,525 million (up 3.7% year-over-year) and net income attributable to owners of the parent company of ¥100,339 million (down 12.7% year-over-year).

Performance results by reportable segments are as follows:

(a)   Japan

Revenue for the fiscal year ended December 31, 2022 amounted to ¥4,702 million (down 6.7% year-over-year) and segment loss amounted to ¥10,643 million (segment loss of ¥11,939 million for the fiscal year ended December 31, 2021).

(b)   Korea

Revenue for the fiscal year ended December 31, 2022 amounted to ¥331,218 million (up 32.4% year-over-year) and segment profit amounted to ¥129,255 million (up 18.4% year-over-year). Revenue in Korea include royalty income of NEOPLE INC. (a subsidiary of NEXON Korea Corporation, our consolidated subsidiary) attributable to license agreements in China.

(c)   China

Revenue for the fiscal year ended December 31, 2022 amounted to ¥3,341 million (up 6.1% year-over-year), and segment profit amounted to ¥1,556 million (down 7.4% year-over-year).

(d)   North America

Revenue for the fiscal year ended December 31, 2022 amounted to ¥13,085 million (down 12.2% year-over-year) and segment loss amounted to ¥6,217 million (segment loss of ¥175 million for the fiscal year ended December 31, 2021).

(e)   Other

Revenue for the fiscal year ended December 31, 2022 amounted to ¥1,368 million (up 10.3% year-over-year) and segment loss amounted to ¥5,311 million (segment loss of ¥4,902 million for the fiscal year ended December 31, 2021).

(2)    Overview of Financial Position

    (a)    Assets, liabilities and equity

(Assets)

    Total assets as of December 31, 2022 amounted to ¥1,042,849 million, an increase of ¥56,217 million from December 31, 2021. Major components include an increase of ¥44,129 million in cash and cash equivalents, an increase of ¥24,662 million in investments accounted for using equity method, an increase of ¥18,931 million in deferred tax assets and a decrease of ¥46,136 million in other financial assets.

(Liabilities)

    Total liabilities as of December 31, 2022 amounted to ¥175,303 million, an increase of ¥34,564 million from December 31, 2021. Major components include an increase of ¥9,455 million in deferred income, an increase of ¥7,997 million in lease liabilities and an increase of ¥7,098 million in income taxes payable.

(Equity)

    Equity as of December 31, 2022 totaled ¥867,546 million, an increase of ¥21,653 million from December 31, 2021. Major components of changes in equity include an increase of ¥21,265 million in other equity interest primarily due to recording of exchange differences on translating foreign operations.

    (b)    Cash flows

    Cash and cash equivalents (collectively, "cash") as of December 31, 2022 were ¥409,368 million, an increase of ¥44,129 million from December 31, 2021. The increase includes ¥30,762 million in effects of exchange rate changes on cash.

    Cash flows from each activity for the fiscal year ended December 31, 2022 and their significant components are as follows:

(Cash flows from operating activities)

    Net cash provided by operating activities was ¥130,144 million, compared to ¥105,914 million for the fiscal year ended December 31, 2021. Major components of the increase include income before income taxes of ¥140,525 million and an increase in deferred income of ¥7,131 million. Major components of the decrease include income taxes paid of ¥39,642 million.

    Net cash provided by operating activities increased year-over-year due to increases in income before income taxes and deferred income.

(Cash flows from investing activities)

    Net cash used in investing activities was ¥10,918 million, compared to net cash of ¥18,084 million provided in the fiscal year ended December 31, 2021. Major cash inflows include a net decrease in time deposit of ¥21,925 million. Major cash outflows include purchases of investments accounted for using equity method of ¥27,790 million.

    Net cash used in investing activities increased year-over-year as a result of a decrease in withdrawal of time deposit.

(Cash flows from financing activities)

    Net cash used in financing activities was ¥105,859 million, compared to ¥21,053 million for the fiscal year ended December 31, 2021. Major cash outflows include purchases of treasury stock of ¥98,824 million.

    Net cash used in financing activities increased year-over-year due to an increase in purchases of treasury stock.

EXHIBIT D
119

(Reference)   The changes in cash flow indicators are as follows:

|  | FY2021 | FY2022 |
|---|---|---|
| Ratio of equity attributable to owners of the parent company (%) | 84.8 | 82.3 |
| Ratio of equity attributable to owners of the parent company at fair value (%) | 200.8 | 244.5 |
| Interest-bearing liabilities to cash flow ratio (years) | 0.1 | 0.2 |
| Interest coverage ratio (times) | 255.9 | 222.3 |

Ratio of equity attributable to owners of the parent company:

Equity attributable to owners of the parent company (end of year) / total assets (end of year)

Ratio of equity attributable to owners of the parent company at fair value:

Market capitalization / total assets (end of year)

Interest-bearing liabilities to cash flow ratio:

Interest-bearing liabilities / cash flows

Interest coverage ratio:

Cash flows / interest paid

(Note 1) All ratios are calculated based on the financial data on a consolidated basis.

(Note 2) Market capitalization is calculated based on the number of shares issued and outstanding, excluding treasury stock.

(Note 3) Cash flows are derived from operating cash flows.

(Note 4) Interest-bearing liabilities cover all liabilities recorded in the consolidated statement of financial position that are subject to interest payment.

EXHIBIT D

120

(3)   Qualitative Information on Consolidated Financial Results Forecast

As the impact of COVID-19 continues, the outlook on the business environment surrounding Nexon Group remains unclear primarily due to the prolonged economic effects of the conflict in Ukraine and the policy interest rate hike in response to global inflation risks. As for the business environment in Japan, while restrictions on human activities were relaxed, the situation remains unpredictable mainly due to the yet unclear global situation and inflation associated with the rapid depreciation of the Japanese yen. However, we do not expect these factors to cause any event that could have material impact on Nexon Group's businesses going forward.

In our consolidated business outlook, we disclose our expectations for the following quarter as a range to provide more accurate information to our shareholders and investors, since it is difficult to derive full-year consolidated forecasts due to uncertainties in projecting the speed of growth of PC online game and mobile game markets in which Nexon Group's main businesses operate, and because our revenue is largely dependent on such uncertain factors as users' preferences and whether or not we have any hit titles.

For the three months ending March 31, 2023, Nexon Group expects consolidated revenue in the range of ¥116,708~125,635 million (up 28.2%~38.0% year-over-year), operating income in the range of ¥45,321~52,502 million (up 17.7%~36.3% year-over-year), income before income taxes in the range of ¥46,987~54,168 million (down 17.9%~5.3% year-over-year), net income in the range of ¥34,267~39,810 million (down 14.6%~0.8% year-over-year), net income attributable to owners of the parent company in the range of ¥34,354~39,787 million (down 14.7%~1.2% year-over-year), and basic earnings per share in the range of ¥40.02~46.35. Nexon Group operates its businesses around the world, in Japan, South Korea, China, the United States and other countries. Major exchange rates for Q1 2023 are expected to be 1 U.S. Dollar = ¥130.35, 100 Korean Won = ¥10.52 and 1 Chinese Yuan = ¥19.18. In general, the exchange rates of the Korean Won and the Chinese Yuan to Japanese Yen are assumed to be linked to the exchange rate of U.S. Dollar to Japanese Yen. Based on this assumption, we expect that every one Japanese Yen move against the U.S. Dollar will have an impact of approximately ¥924 million on revenue and approximately ¥389 million on operating income for the three months ending March 31, 2023.

As for revenue based on customer location for the three months ending March 31, 2023, our expectations are as follows.

In Korea, we expect overall PC online revenue to increase year-over-year. We expect our major titles, *EA SPORTS™ FIFA ONLINE 4*, *Dungeon&Fighter* and *MapleStory*, to maintain their strong momentum from Q4 2022 and revenues to increase year-over-year. We also expect to benefit from *KartRider: Drift*, which started its preseason on January 12th and is scheduled to start official service on March 9th.

For mobile in Korea, we expect Q1 revenue to increase year-over-year. We expect to benefit from *HIT2* and *KartRider: Drift* and anticipate growth in *EA SPORTS™ FIFA MOBILE*. We expect these to be partially offset by year-over-year revenue decreases in older mobile titles.

In China, we expect revenue to increase year-over-year driven by the growth in *Dungeon&Fighter*, our major PC online title. For *Dungeon&Fighter*, we saw a turnaround in active users which increased year-over-year in Q4 2022. Under this positive trend, we introduced the Lunar New Year update on January 12th. We expect revenue to grow year-over-year driven by the excellent start of the Lunar New Year update accompanied by strong sales of avatar package. In 2023, we will continue to focus on communication with players and stable operation of the game.

In Japan, we expect revenue to be roughly flat year-over-year. While we expect to benefit from new games and growth of *Blue Archive*, we expect this to be offset by revenue decreases in older mobile titles.

In North America and Europe, we expect revenue to increase year-over-year. While we expect to benefit from new games including *KartRider: Drift* and favorable foreign exchange rates, we expect these to be partially offset by decreases in *MapleStory M* and *Choices: Stories You Play*.

EXHIBIT D
121

In Rest of World, we expect revenue to increase year-over-year. While we expect to benefit from new games including *KartRider: Drift*, we expect this to be partially offset by a decrease in *MapleStory*.

On the cost side, we expect a year-over-year increase in costs for the three months ending March 31, 2023. We expect increased royalty costs due to revenue increases from publishing titles (i.e., *EA SPORTS™ FIFA ONLINE 4* and *EA SPORTS™ FIFA MOBILE*) as well as a contribution from *KartRider: Drift*, and increased PG fees due to revenue increases from mobile titles. In addition, we expect increased HR costs related to additional recruitment of staff required for the development and operation of multiple major titles as well as annual salary hike, increased marketing expenses primarily associated with promotions for new games such as *KartRider: Drift*, increased outsourcing fees associated with new game development, and increased cloud service costs due to mobile business growth.

Our business outlook is based on information currently available to us, which includes various uncertainties. Therefore, actual performance may vary from our outlook due to changes in the business condition.

(4)   Basic Policy on the Distribution of Profits and Dividends for the Current and Next Fiscal Year

Nexon recognizes that the return of profits to shareholders is an important management issue. Our policy is to return profits to shareholders through dividend payments, share repurchases and other means depending on the results of operations and upon full consideration of factors including the state of shareholder equity, management results and revenue outlook. We intend to use our internal capital reserves by taking into account the balance between return of profits to shareholders and other considerations such as the expansion of our existing business and development of new businesses to strengthen our management base and enrich our future business domain, and effective investments, primarily M&As and acquisition of game publishing rights, to proactively develop our business for future growth.

In accordance with the policy above, we are scheduled to pay out year-end dividends of 5.0 yen per share for the fiscal year ended December 31, 2022. Furthermore, interim and year-end dividends of 5.0 yen per share are also scheduled for the fiscal year ending December 31, 2023.

At Nexon, dividends of surplus are decided by a resolution of the Board of Directors. Furthermore, Nexon's Articles of Incorporation stipulates that "The decisions of the Company with regards to dividends of surplus and other matters as stipulated under each provision of Article 459 (1) of the Companies Act shall not require a resolution of the General Meeting of Shareholders but shall be decided by a resolution of the Board of Directors, except when otherwise provided for by laws and regulations," and that "The record date for the Company's year-end dividends shall be December 31 of each year" and "The record date for the Company's interim dividends shall be June 30 of each year."

EXHIBIT D
122

2. Current Status of the Corporate Group

As of December 31, 2022, Nexon Group consists of NEXON Co., Ltd. ("Nexon"), Nexon's 41 consolidated subsidiaries and 15 affiliated companies and joint ventures, and is engaged in the production, development and service of PC online and mobile games. In Japan, Nexon is responsible for developing the overall strategies for our products and services and operating the business, while overseas, our local consolidated subsidiaries do so in their respective regions as independently managed entities.

Accordingly, Nexon Group consists of geographical segments based on production, development and service of PC online and mobile games. The reportable segments include "Japan," "Korea," "China," "North America," and "Others." Europe and Asian countries are included in "Others."

(Major consolidated subsidiaries as of December 31, 2022)

| | |
|---|---|
| Korea: | NEXON Korea Corporation; NEOPLE INC.; NEXON Games Co., Ltd.; JoongAng Pangyo Development Co., Ltd.; Mirae Asset Global Innovation Growth Focus Equity Privately Placed Investment Trust; VIP Global Super Growth Hedge Fund |
| China: | Lexian Software Development (Shanghai) Co., Ltd. |
| North America: | Nexon America Inc.; Nexon US Holding Inc.; Pixelberry Studios |
| Others: | Embark Studios AB |

Nexon Group classifies its lines of business into (a) PC online business and (b) Mobile business.

(1) Lines of business

(a) PC online business

The PC online business mostly involves the production, development and service of PC online games. Additional services we offer include consulting related to PC online game service, in-game advertising, and merchandising incidental to the PC online business.

Major titles serviced by Nexon Group include *MapleStory*, *Dungeon&Fighter* and *EA SPORTS™ FIFA ONLINE 4*. When we launch a new title, we flexibly adapt to market differences by conducting a test service of the game, taking into account the characteristics and preferences of users in the respective areas of the world and the genre of the game to be serviced.

PC online games developed within Nexon Group, by NEXON Korea Corporation, NEOPLE INC. or other group companies, are directly serviced by themselves or, in regions that have large markets, through other members of Nexon Group such as Nexon, Nexon America Inc., NEXON TAIWAN LIMITED or Nexon Thailand Co., Ltd. We have endeavored to maximize business synergy effects by establishing a closely coordinated structure within Nexon Group for the production, development and service of PC online games. In addition, with regards to PC online games developed by non-Nexon Group developers and for which we have acquired publishing rights, we try to maximize revenue by publishing those games through Nexon Group so that they reach a large audience and we also build rapport with such developers as we service their games. In regions where Nexon Group does not directly service games, we go through local publishers to service in-house developed PC online games. Through such business initiatives as above, we are making the utmost effort to service fun and creative games to users all over the world.

EXHIBIT D
123

As for the consulting business, Lexian Software Development (Shanghai) Co., Ltd. provides Chinese publishers with consulting services for setting up and maintaining billing systems (please see the Note below) and membership systems, business strategy development, game operation and marketing.

In Korea, Nexon Networks Corporation provides services related to customer support and net-café operation when offering PC online games. N Media Platform Co., LTD. provides net-cafés with advertisement platform and operation management services.

The in-game advertisement business capitalizes on the strengths of ad placements within PC online games, i.e. ongoing updates of game contents and advertisement information, and leverages such features as that enabling direct exposure to players through in-game usage of functional items equipped with an advertisement function, or that enabling simultaneous exposure of different advertisements to their respective target users through dedicated servers that comprehensively manage all advertisements.

The merchandising business engages in the production and sales of goods that feature popular characters from games owned by Nexon Group.

(Note) Billing system:    An electronic billing confirmation service related to the usage of internet or email services provided by enterprises.

(b)    Mobile business

The mobile business involves the development and service of mobile games playable on smartphones and tablet devices. Nexon Group develops and services mobile games in Japan and overseas. In Japan, Nexon is engaged in mobile game service. In Korea, mobile game development and service are conducted primarily through NEXON Korea Corporation, NEOPLE INC. and NEXON Games Co., Ltd. In the U.S., mobile game development and service are conducted through Big Huge Games, Inc., and Pixelberry Studios.

(2)    Business models for PC online and mobile games

Nexon's PC online game and mobile game business models can be categorized into the following three types:

(a)    Self-publishing model

Self-publishing model is a model where a game developed by a Nexon Group entity such as NEXON Korea Corporation or NEOPLE INC. is directly serviced (including the setup of a network environment, marketing and user support) by themselves or by Nexon or another Nexon Group entity including Nexon America Inc., NEXON TAIWAN LIMITED and Nexon Thailand Co., Ltd.

Once a game is launched, service fees are collected from users according to the pre-determined monetization method. In many cases, we pay fees to payment gateway providers to have them collect service fees from users on our behalf.

(b)    Licensing model

Licensing model is a model where Nexon Group, as a copyright holder of commercialized games, enters into licensing agreements with outside publishers and grants them the right to publish our games.

A publisher who enters into a licensing agreement with us and acquires the publishing rights for a game will be responsible for setting up the network environment, marketing and user support necessary to service the game. The respective Nexon Group entity holding the copyright will provide support for such activities to enable the publisher to generate greater revenue.

EXHIBIT D
124

Nexon Group entities engaged in the development of PC online games, including NEXON Korea Corporation and NEOPLE INC., have licensed publishing rights to non-Nexon Group publishers in China, for instance.

Under the licensing agreements where publishing rights are granted by Nexon Group, in principle, license is granted to a single publisher per country per game title. In other words, Nexon Group grants local exclusive publishing rights to a publisher. The respective Nexon Group entity holding the game copyright will provide game content updates and technical support on an ongoing basis to the publisher and in return receive contract money at the time of entering into the agreement, and once the game launches, receive a predetermined rate as royalty in accordance with the service fees that the publisher collects from users.

The conditions for royalty and other payments are determined individually for each agreement, taking into account the real local situation of the country in which the publisher is located.

(c)   Licensed publishing model

Licensed publishing model is a model where Nexon Group enters into a licensing agreement with a non-Nexon Group developer of PC online or mobile games to acquire exclusive publishing rights to a game within a specified region. Nexon Group will set up the network environment for such service, conduct marketing and user support, as well as service the licensed game.

In this case, we will collect service fees from users and pay a certain amount out of it as royalty to the outside PC online or mobile game developer.

Nexon Group's deal with Valve Corporation related to *Counter-Strike Online* and our deals with Electronic Arts Inc. related to *EA SPORTS™ FIFA ONLINE 4, EA SPORTS™ FIFA ONLINE 4 M* and *EA SPORTS™ FIFA MOBILE* fall into this category.


(3)   Monetization models for PC online games

Currently, there are three types of monetization methods for PC online games as follows. Nexon Group mainly uses the method under (a) for monetization.

(a)   Microtransaction model of paying to purchase in-game items

Microtransaction is a model where a game is basically offered for free, but users pay to purchase the items (e.g. costumes, weapons) they need or to use specific services.

The basic game is free to play, which lowers the mental hurdle for a user to start playing a new PC online game. This allows new users to casually start playing a game, but on the other hand, it means that revenue generated by a game could be impacted by how appealing the in-game items offered for purchase are. In recent years, with heightening market awareness of free-to-play games, there are more and more PC online games in the market as a whole which have adopted this model to acquire new users.

Nexon Group was early to adopt the microtransaction model to PC online games because we wish for more users to enjoy the services of games we offer.

(b)   Pay-as-you-go according to the period of use (subscription model)

Pay-as-you-go (subscription) is a model where users are charged with a fixed service fee based on the number of months, days or hours of use as fee for playing a game.

Although this method can generate a constant level of revenue by securing a certain number of users, it is likely that, compared to free-to-play games, new users would find making fixed monthly payments burdensome when starting a game.

EXHIBIT D
125

(c)   Advertisement revenue model

Advertisement revenue model is a model where a game is free to play and revenue is generated through advertisements which are displayed on screen before, after or during the game. Since advertisements under this model are primarily sponsored by businesses, it is typically used in combination with method (a) or (b) above, and the popularity of the game itself (i.e. user traffic) will have a direct impact on revenue.

(4)   Monetization models for mobile games

Currently, there are two types of monetization methods for mobile games as follows. Nexon Group mainly uses the method under (a) for monetization.

(a) Microtransaction model of paying to purchase in-game items

Microtransaction is a model where a game is basically offered for free, but users pay to purchase the items (e.g. costumes, weapons) they need or to use specific services.

The basic game is free to play, which lowers the mental hurdle for a user to start playing a new mobile game. This allows new users to casually start playing a game, but on the other hand, it means that revenue generated by a game could be impacted by how appealing the in-game items offered for purchase are. Microtransaction model is the mainstream in the mobile game market.

(b)   Advertisement revenue model

Advertisement revenue model is a model where a game is free to play and revenue is generated through advertisements which are displayed on screen before, after or during the game. Since advertisements under this model are primarily sponsored by businesses, it is typically used in combination with method (a) above, and the popularity of the game itself (i.e. user traffic) will have a direct impact on revenue.

EXHIBIT D
126

[Business system chart]
 Chart 1 shows the above described matters.

 <Chart 1>



(Note) In general, only one license is granted for a game in each country, providing the local company with an exclusive
right for distribution.

 The royalty income flow within Nexon Group is shown in Chart 2, covering Nexon and its major subsidiaries.

 <Chart 2>



## 3.   Basic Concept for Selection of the Accounting Standards

Nexon Group has applied International Accounting Standards since the fiscal year ended December 31, 2013, with
the aim to enhance the global comparability and convenience of financial information in the capital market.

EXHIBIT D
127

4.   Consolidated Financial Statements and Major Notes

(1)   Consolidated Statement of Financial Position

(Millions of yen)

| | As of December 31, 2021 | As of December 31, 2022 |
|---|---|---|
| Assets | | |
| Current assets | | |
| Cash and cash equivalents | 365,239 | 409,368 |
| Trade and other receivables | 17,577 | 30,444 |
| Other deposits | 169,689 | 162,490 |
| Other financial assets | 29,140 | 23,078 |
| Other current assets | 12,072 | 16,649 |
| Total current assets | 593,717 | 642,029 |
| Non-current assets | | |
| Property, plant and equipment | 24,448 | 26,885 |
| Goodwill | 38,938 | 40,136 |
| Intangible assets | 17,703 | 9,655 |
| Right-of-use assets | 10,985 | 19,079 |
| Investments accounted for using equity method | 58,933 | 83,595 |
| Other financial assets | 202,588 | 162,514 |
| Other non-current assets | 1,106 | 1,811 |
| Deferred tax assets | 38,214 | 57,145 |
| Total non-current assets | 392,915 | 400,820 |
| Total assets | 986,632 | 1,042,849 |

—13—

|  | | (Millions of yen) |
|---|---|---|
|  | As of December 31, 2021 | As of December 31, 2022 |
| **Liabilities and equity** | | |
| Liabilities | | |
| Current liabilities | | |
| Trade and other payables | 9,354 | 14,705 |
| Deferred income | 11,030 | 18,942 |
| Income taxes payable | 16,599 | 23,697 |
| Lease liabilities | 3,045 | 4,045 |
| Provisions | 5,787 | 10,164 |
| Other current liabilities | 7,510 | 11,581 |
| Total current liabilities | 53,325 | 83,134 |
| Non-current liabilities | | |
| Deferred income | 14,354 | 15,897 |
| Lease liabilities | 12,282 | 19,279 |
| Other financial liabilities | 1,803 | 1,447 |
| Provisions | 323 | 355 |
| Other non-current liabilities | 4,687 | 4,820 |
| Deferred tax liabilities | 53,965 | 50,371 |
| Total non-current liabilities | 87,414 | 92,169 |
| Total liabilities | 140,739 | 175,303 |
| Equity | | |
| Capital stock | 34,255 | 38,972 |
| Capital surplus | 14,961 | 18,331 |
| Treasury Stock | (17,863) | (16,464) |
| Other equity interest | 92,747 | 114,012 |
| Retained earnings | 712,568 | 703,342 |
| Total equity attributable to owners of the parent company | 836,668 | 858,193 |
| Non-controlling interests | 9,225 | 9,353 |
| Total equity | 845,893 | 867,546 |
| Total liabilities and equity | 986,632 | 1,042,849 |

EXHIBIT D
129

(2)    Consolidated Income Statement

(Millions of yen)

| | Fiscal Year ended December 31, 2021 | Fiscal Year ended December 31, 2022 |
|---|---|---|
| Revenue | 274,462 | 353,714 |
| Cost of sales | (72,121) | (105,778) |
| Gross profit | 202,341 | 247,936 |
| Selling, general and administrative expenses | (108,490) | (139,297) |
| Other income | 805 | 575 |
| Other expenses | (3,115) | (5,518) |
| Operating income | 91,541 | 103,696 |
| Finance income | 47,874 | 65,323 |
| Finance costs | (1,355) | (12,892) |
| Loss on revaluation | (1,589) | (5,356) |
| Share of loss of investments accounted for using equity method | (999) | (10,246) |
| Income before income taxes | 135,472 | 140,525 |
| Income taxes expense | (22,406) | (40,535) |
| Net income | 113,066 | 99,990 |
| Attributable to: | | |
| Owners of the parent company | 114,888 | 100,339 |
| Non-controlling interests | (1,822) | (349) |
| Net income | 113,066 | 99,990 |
| Earnings per share (attributable to owners of the parent company) | (Yen) | (Yen) |
| Basic earnings per share | 128.91 | 114.74 |
| Diluted earnings per share | 126.55 | 113.81 |

EXHIBIT D
130

(3)     Consolidated Statement of Comprehensive Income

(Millions of yen)

| | Fiscal Year ended December 31, 2021 | Fiscal Year ended December 31, 2022 |
|---|---|---|
| Net income | 113,066 | 99,990 |
| Other comprehensive income | | |
| Items that will not be reclassified to net income | | |
| Financial assets measured at fair value through other comprehensive income | 8,610 | (56,299) |
| Re-measurement of defined benefit pension plans | (19) | 4 |
| Other comprehensive income under equity method | — | 46 |
| Income taxes | (2,834) | 15,378 |
| Total items that will not be reclassified to net income | 5,757 | (40,871) |
| Items that may be reclassified subsequently to net income | | |
| Exchange differences on translating foreign operations | 12,445 | 55,609 |
| Other comprehensive income under equity method | 12 | 4 |
| Total items that may be reclassified subsequently to net income | 12,457 | 55,613 |
| Total other comprehensive income | 18,214 | 14,742 |
| Total comprehensive income | 131,280 | 114,732 |
| Attributable to: | | |
| Owners of the parent company | 132,985 | 114,208 |
| Non-controlling interests | (1,705) | 524 |
| Total comprehensive income | 131,280 | 114,732 |

EXHIBIT D
131

(4)    Consolidated Statement of Changes in Equity

Fiscal Year ended December 31, 2021

(Millions of yen)

| | Equity attributable to owners of the parent company | | | | | | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|
| | Capital stock | Capital surplus | Treasury stock | Other equity interest | Retained earnings | Total | | |
| Balance at January 1, 2021 | 22,679 | 17,421 | (0) | 69,975 | 599,807 | 709,882 | 10,563 | 720,445 |
| Net income | — | — | — | — | 114,888 | 114,888 | (1,822) | 113,066 |
| Other comprehensive income | — | — | — | 18,097 | — | 18,097 | 117 | 18,214 |
| Total comprehensive income | — | — | — | 18,097 | 114,888 | 132,985 | (1,705) | 131,280 |
| Issue of shares | 11,576 | 11,576 | — | — | — | 23,152 | — | 23,152 |
| Stock issue cost | — | (83) | — | — | — | (83) | — | (83) |
| Payment of dividends | — | — | — | — | (4,441) | (4,441) | — | (4,441) |
| Share-based compensation | — | — | — | 6,989 | — | 6,989 | — | 6,989 |
| Changes in interests in subsidiaries | — | (15,890) | — | — | — | (15,890) | 367 | (15,523) |
| Change in scope of consolidation | — | 1,939 | (1,914) | — | — | 25 | — | 25 |
| Purchase of treasury stock | — | (2) | (16,032) | — | — | (16,034) | — | (16,034) |
| Disposal of treasury stock | — | — | 83 | — | — | 83 | — | 83 |
| Reclassification from other equity interest to retained earnings | — | — | — | (2,314) | 2,314 | — | — | — |
| Total transactions with the owners | 11,576 | (2,460) | (17,863) | 4,675 | (2,127) | (6,199) | 367 | (5,832) |
| Balance at December 31, 2021 | 34,255 | 14,961 | (17,863) | 92,747 | 712,568 | 836,668 | 9,225 | 845,893 |

Fiscal Year ended December 31, 2022

(Millions of yen)

| | Equity attributable to owners of the parent company | | | | | | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|
| | Capital stock | Capital surplus | Treasury stock | Other equity interest | Retained earnings | Total | | |
| Balance at January 1, 2022 | 34,255 | 14,961 | (17,863) | 92,747 | 712,568 | 836,668 | 9,225 | 845,893 |
| Net income | — | — | — | — | 100,339 | 100,339 | (349) | 99,990 |
| Other comprehensive income | — | — | — | 13,869 | — | 13,869 | 873 | 14,742 |
| Total comprehensive income | — | — | — | 13,869 | 100,339 | 114,208 | 524 | 114,732 |
| Issue of shares | 4,717 | 4,717 | — | — | — | 9,434 | — | 9,434 |
| Stock issue cost | — | (33) | — | — | — | (33) | — | (33) |
| Payment of dividends | — | — | — | — | (8,785) | (8,785) | — | (8,785) |
| Share-based compensation | — | — | — | 6,616 | — | 6,616 | — | 6,616 |
| Forfeiture of share acquisition rights | — | — | — | (27) | 27 | — | — | — |
| Changes in interests in subsidiaries | — | (1,257) | — | — | — | (1,257) | (396) | (1,653) |
| Purchase of treasury stock | — | (57) | (98,767) | — | — | (98,824) | — | (98,824) |
| Disposal of treasury stock | — | — | 166 | — | — | 166 | — | 166 |
| Retirement of treasury stock | — | — | 100,000 | — | (100,000) | — | — | — |
| Reclassification from other equity interest to retained earnings | — | — | — | 807 | (807) | — | — | — |
| Total transactions with the owners | 4,717 | 3,370 | 1,399 | 7,396 | (109,565) | (92,683) | (396) | (93,079) |
| Balance at December 31, 2022 | 38,972 | 18,331 | (16,464) | 114,012 | 703,342 | 858,193 | 9,353 | 867,546 |

—17—

EXHIBIT D
132

(5)　　Consolidated Statement of Cash Flows

|  | Fiscal Year ended<br>December 31, 2021 | (Millions of yen)<br>Fiscal Year ended<br>December 31, 2022 |
|---|---|---|
| Cash flows from operating activities | | |
| Income before income taxes | 135,472 | 140,525 |
| Depreciation and amortization | 8,468 | 6,767 |
| Share-based compensation expenses | 10,508 | 9,691 |
| Interest and dividend income | (6,452) | (12,986) |
| Interest expense | 415 | 588 |
| Impairment loss | 2,941 | 5,337 |
| Loss on revaluation | 1,589 | 5,356 |
| Share of loss of investments accounted for using equity method | 999 | 10,246 |
| Loss (gain) on sale of investments accounted for using equity method | 10 | (9,531) |
| Loss (gain) on valuation of securities | (703) | 6,498 |
| Loss (gain) on sale and redemption of securities | (3,734) | 4,058 |
| Foreign exchange gain | (10,022) | (17,241) |
| Decrease (increase) in trade and other receivables | 4,816 | (8,968) |
| Increase in other current assets | (3,136) | (1,429) |
| Increase (decrease) in trade and other payables | (1,466) | 4,089 |
| Increase (decrease) in deferred income | (1,954) | 7,131 |
| Increase (decrease) in provisions | (1,188) | 4,216 |
| Increase (decrease) in other current liabilities | (1,389) | 2,370 |
| Other | 1,157 | 1,212 |
| Subtotal | 136,331 | 157,929 |
| Interest and dividends received | 7,587 | 12,442 |
| Interest paid | (415) | (585) |
| Income taxes paid | (37,589) | (39,642) |
| Net cash provided by operating activities | 105,914 | 130,144 |
| Cash flows from investing activities | | |
| Net decrease (increase) in restricted deposit | 334 | (410) |
| Net decrease in time deposit | 110,550 | 21,925 |
| Purchases of property, plant and equipment | (1,585) | (2,801) |
| Proceeds from sales of property, plant and equipment | 68 | 120 |
| Purchases of intangible assets | (12,541) | (3,101) |
| Payments associated with increase in long-term prepaid expenses | (3,210) | (2,613) |
| Purchases of securities by investment funds under consolidated subsidiaries | (37,167) | (17,539) |
| Proceeds from sale of securities by investment funds under consolidated subsidiaries | 35,512 | 18,478 |
| Purchases of investment securities | (26,492) | (1,245) |
| Proceeds from sale and redemption of investment securities | 6,327 | 326 |
| Purchases of investments accounted for using equity method | (52,637) | (27,790) |
| Proceeds from sale of investments accounted for using equity method | 0 | 9,610 |
| Payments for acquisition of subsidiaries | — | (1,258) |
| Payments for short-term loans receivable | (16,630) | (163) |
| Collection of short-term loans receivable | 16,620 | 178 |
| Payments for long-term loans receivable | (1,397) | (4,309) |
| Collection of long-term loans receivable | 32 | 27 |
| Other | 300 | (353) |
| Net cash provided by (used in) investing activities | 18,084 | (10,918) |

—18—

EXHIBIT D
133

| | Fiscal Year ended December 31, 2021 | (Millions of yen) Fiscal Year ended December 31, 2022 |
|---|---|---|
| Cash flows from financing activities | | |
| Net decrease in short-term borrowings | (2,094) | — |
| Proceeds from exercise of stock options | 4,101 | 6,023 |
| Purchases of treasury stock | (16,034) | (98,824) |
| Purchases of treasury stock by subsidiaries | — | (1,248) |
| Cash dividends paid | (4,441) | (8,785) |
| Repayment of lease liability | (2,585) | (3,025) |
| Net cash used in financing activities | (21,053) | (105,859) |
| Net increase in cash and cash equivalents | 102,945 | 13,367 |
| Cash decrease equivalents short-term borrowings | 252,570 | 365,239 |
| Effects of exchange rate changes on cash and cash equivalents | 9,724 | 30,762 |
| Cash and cash equivalents at the end of the period | 365,239 | 409,368 |

EXHIBIT D
134

(6)    Notes to Consolidated Financial Statements

(Notes on Going Concern Assumption)

Not applicable.


(Changes in Significant Subsidiaries during the Period)

Not applicable.


(Changes in Accounting Policies and Changes in Accounting Estimates)

Changes in accounting policies required by IFRS

The accounting policies used to prepare these consolidated financial statements are consistent with those applied in the consolidated financial statements for the year ended December 31, 2021 unless otherwise noted, except for the new standards applied as listed below.

Nexon Group applied the following standards from Q1 2022, but the application of these standards did not have material impacts on the fiscal year ended December 31, 2022.

| Standards | Title | Overview of New or Revised Standard |
|---|---|---|
| IFRS 3 | Business Combinations | Updated the reference to the "Conceptual Framework for Financial Reporting" |
| IAS 16 | Property, Plant and Equipment | Clarified that the deduction of proceeds from selling items produced before an item of PPE is available for use from the cost of that PPE is prohibited |
| IAS 37 | Provisions, Contingent Liabilities and Contingent Assets | Clarified what costs an entity considers in assessing whether a contract is onerous |
| IFRS 9 | Financial Instruments | Clarified the fees an entity includes in the test for derecognition of financial liabilities |
| IFRS 16 | Leases | Extended the availability of the practical expedient provided in COVID-19-Related Rent Concessions released on May 28, 2020 by one year. |

(Changes in Presentation Method)

Consolidated statement of cash flows

"Loss (gain) on sale of investments accounted for using equity method" and "Loss (gain) on sale and redemption of securities" which were included in "Other" under "Cash flows from operating activities" in the fiscal year ended December 31, 2021 are separately presented from the fiscal year ended December 31, 2022 due to increases in their monetary significance.

Consequently, ¥(2,567) million presented as "Other" under "Cash flows from operating activities" in the consolidated statement of cash flows for the fiscal year ended December 31, 2021 have been reclassified as "Loss (gain) on sale of investments accounted for using equity method" of ¥10 million, "Loss (gain) on sale and redemption of securities" of ¥(3,734) million, and "Other" of ¥1,157 million.

In addition, "Payments for long-term loans receivable" and "Collection of long-term loans receivable" which were included in "Other" under "Cash flows from investing activities" in the fiscal year ended December 31, 2021 are separately presented from the fiscal year ended December 31, 2022 due to increases in their monetary significance.

Consequently, ¥(1,065) million presented as "Other" under "Cash flows from investing activities" in the consolidated statement of cash flows for the fiscal year ended December 31, 2021 have been reclassified as "Payments for long-term loans receivable" of ¥(1,397) million, "Collection of long-term loans receivable" of ¥32 million, and "Other" of ¥300 million.

—20—

(Notes on Significant Changes in the Amount of Equity Attributable to Owners of the Parent Company)

(a) For the fiscal year ended December 31, 2021 (From January 1, 2021 through December 31, 2021)

(i) Amount of dividends paid

|  | Class of stock | Total dividends | Dividend per share | Record date | Effective date |
|---|---|---|---|---|---|
|  |  | (million yen) | (yen) |  |  |
| Resolution of the Board of Directors on February 17, 2021 | Common stock | 2,217 | 2.5 | December 31, 2020 | March 26, 2021 |
| Resolution of the Board of Directors on August 11, 2021 | Common stock | 2,224 | 2.5 | June 30, 2021 | September 27, 2021 |

(ii) Change in scope of consolidation

Stiftelsen Embark Incentive ("Foundation") acquired Nexon's stock in the amount of ¥1,914 million (905,144 shares) by third-party allotment as compensation for our 100% acquisition of Embark Studios AB. As we have consolidated the Foundation in our consolidated financial statements from the three months ended September 30, 2021, treasury stock includes Nexon's stock owned by the Foundation. Refer to (iv) below for details on the third-party allotment.

(iii) Purchases of treasury stock

Nexon's treasury stock increased by ¥16,032 million as a result of the purchase of 7,042,600 shares of treasury stock during the fiscal year ended December 31, 2021 based on a resolution of the Board of Directors on November 19, 2021.

(iv) Acquisition of additional non-controlling interest

In the three months ended September 30, 2021, Nexon conducted a third-party allotment ("Third-party Allotment") for the purpose of acquiring all of the outstanding shares of our consolidated subsidiary, Embark Studios AB, owned by shareholders other than Nexon and its subsidiaries (i.e. to turn Embark Studios AB into our wholly-owned subsidiary) by issuing 7,388,930 shares of Nexon's common stock to the shareholders of Embark Studios AB (excluding Nexon and its subsidiaries) in exchange for their granting of 176,469,789 shares of Embark Studios AB's common stock owned by them to Nexon as a contribution in-kind. The fair value per share of Nexon's common stock granted to the allottees on the payment due date of the Third-party Allotment is measured at ¥2,115, which was the closing price of Nexon's common stock on the Tokyo Stock Exchange on August 23, 2021.

As a result of this Third-Party Allotment, our capital stock and capital surplus each increased by ¥7,814 million, non-controlling interests increased by ¥204 million, exchange differences on translating foreign operations increased by ¥95 million and capital surplus decreased by ¥15,927 million. Due to this increase in non-controlling interests, Nexon Group no longer has any non-controlling interest in Embark Studios AB.

EXHIBIT D
136

(b) For the fiscal year ended December 31, 2022 (From January 1, 2022 through December 31, 2022)

(i) Amount of dividends paid

| | Class of stock | Total dividends | Dividend per share | Record date | Effective date |
|---|---|---|---|---|---|
| | | (million yen) | (yen) | | |
| Resolution of the Board of Directors on February 17, 2022 (Note 1) | Common stock | 4,459 | 5.0 | December 31, 2021 | March 28, 2022 |
| Resolution of the Board of Directors on August 9, 2022 (Note 2) | Common stock | 4,327 | 5.0 | June 30, 2022 | September 26, 2022 |

(Note) 1. Total dividends include dividends of ¥4 million for Nexon's stock owned by the Foundation.

2. Total dividends include dividends of ¥4 million for Nexon's stock owned by the Foundation.

(ii) Purchases of treasury stock

Nexon's treasury stock increased by ¥23,968 million as a result of a purchase of 9,340,200 shares of treasury stock at market on the Tokyo Stock Exchange during the six months ended June 30, 2022 based on a resolution of the Board of Directors on November 19, 2021.

In addition, Nexon's treasury stock increased by ¥60,000 million as a result of a purchase of 20,188,400 shares of treasury stock through off-auction own share repurchase trading (ToSTNeT-3) on the Tokyo Stock Exchange on June 15, 2022 based on a resolution of the Board of Directors on June 14, 2022.

Furthermore, Nexon's treasury stock increased by ¥14,799 million as a result of a purchase of 5,168,300 shares of treasury stock at market on the Tokyo Stock Exchange during the three months ended December 31, 2022 based on a resolution of the Board of Directors' meeting held on November 9, 2022.

(iii) Retirement of treasury stock

During the three months ended September 30, 2022, Nexon retired 36,571,300 shares of its treasury stock based on a resolution of the Board of Directors' meeting held on August 9, 2022. As a result, treasury stock and retained earnings each decreased by ¥100,000 million.

EXHIBIT D

137

(Segment Information)

(1) Outline of reportable segments

   Reportable segments of Nexon Group are components of Nexon Group, for which separate financial statements are available, that are evaluated regularly by the board of directors in deciding how to allocate management resources and in assessing performance.

   Nexon Group is engaged in production, development and distribution of PC online games and mobile games, and the Company (in Japan) and its local consolidated subsidiaries (overseas) develop overall strategies and operate business activities for their respective products and services in each region as independent units. Accordingly, Nexon Group is comprised of geographical business segments based on production, development, and distribution of PC online games and mobile games. Nexon Group has formed its reportable segments by consolidating business segments based on the geographic location since subsidiaries in the same region, due to their business characteristics, receive similar impact of the foreign exchange fluctuation risk on their operating results and the ratio of the impact to operating results is high. There are five reportable segments: "Japan", "Korea", "China", "North America" and "Other" which includes Europe and Asian countries.

   Furthermore, IFRS 15 *Revenue from Contracts with Customers* is applied by Nexon Group. We have therefore presented the revenue arising from our contracts with customers by breaking it down into PC online, mobile and other revenues based on such contracts with customers.

EXHIBIT D

138

(2)    Revenue, profit or loss by reportable segment

Information on the segments of Nexon Group is as follows:

Fiscal year ended December 31, 2021 (From January 1, 2021 to December 31, 2021)

(Millions of yen)

| | Reportable Segments | | | | | | Adjustments (Note 4) | Consolidated |
| | Japan | Korea | China | North America | Other | Total | | |
|---|---|---|---|---|---|---|---|---|
| Revenue | | | | | | | | |
| Revenue from external customers | | | | | | | | |
| PC online | 3,292 | 180,975 | 3,150 | 6,051 | 1,231 | 194,699 | — | 194,699 |
| Mobile | 1,729 | 67,497 | — | 8,844 | 8 | 78,078 | — | 78,078 |
| Other | 21 | 1,655 | — | 9 | 0 | 1,685 | — | 1,685 |
| Total revenue from external customers | 5,042 | 250,127 | 3,150 | 14,904 | 1,239 | 274,462 | — | 274,462 |
| Intersegment revenue | 1,003 | 2,753 | — | 890 | 549 | 5,195 | (5,195) | — |
| Total | 6,045 | 252,880 | 3,150 | 15,794 | 1,788 | 279,657 | (5,195) | 274,462 |
| Segment profit or loss (Note 1) | (11,939) | 109,191 | 1,680 | (175) | (4,902) | 93,855 | (4) | 93,851 |
| Other income (expense), net | — | — | — | — | — | — | — | (2,310) |
| Operating income | — | — | — | — | — | — | — | 91,541 |
| Finance income (costs), net (Note 5) | — | — | — | — | — | — | — | 46,519 |
| Loss on revaluation (Note 7) | — | — | — | — | — | — | — | (1,589) |
| Share of loss of investments accounted for using equity method | — | — | — | — | — | — | — | (999) |
| Income before income taxes | — | — | — | — | — | — | — | 135,472 |
| (Other items) | | | | | | | | |
| Depreciation and amortization (Note 6) | 5 | 7,203 | 116 | 192 | 952 | 8,468 | — | 8,468 |
| Impairment loss | 80 | 2,815 | — | 46 | — | 2,941 | — | 2,941 |
| Capital expenditures (Note 3) | 37 | 3,713 | 42 | 1,190 | 203 | 5,185 | — | 5,185 |

(Notes) 1.  Segment profit or loss is calculated by deducting cost of sales and selling, general and administrative expenses from revenue.

2.  Price for intersegment transactions is based on the general market price.

3.  Capital expenditures include investments in property, plant and equipment, right-of-use assets and intangible assets. However, investment in crypto-assets made through an exchange is excluded from the investment in intangible assets.

4.  Adjustments in segment profit or loss of ¥(4) million represent elimination of intersegment transactions.

5.  A major component of finance income is foreign exchange gain of ¥36,432 million.

6.  In addition to property, plant and equipment and intangible assets, depreciation arising from right-of-use assets is included.

7.  Loss on revaluation recognized in profit or loss due to the revaluation of an intangible asset (investment in crypto-assets made through an exchange).

8.  For PC online and mobile, performance obligations are fulfilled and revenues are recognized over a certain period of time mainly because control over services is transferred over a certain period of time.

—24—

EXHIBIT D
139

Fiscal year ended December 31, 2022 (From January 1, 2022 to December 31, 2022)

(Millions of yen)

| | Reportable Segments | | | | | | Adjust-ments (Note 4) | Consoli-dated |
|---|---|---|---|---|---|---|---|---|
| | Japan | Korea | China | North America | Other | Total | | |
| Revenue | | | | | | | | |
| Revenue from external customers | | | | | | | | |
| PC online | 3,455 | 227,757 | 3,341 | 6,310 | 1,367 | 242,230 | — | 242,230 |
| Mobile | 1,223 | 101,813 | — | 6,766 | — | 109,802 | — | 109,802 |
| Other | 24 | 1,648 | — | 9 | 1 | 1,682 | — | 1,682 |
| Total revenue from external customers | 4,702 | 331,218 | 3,341 | 13,085 | 1,368 | 353,714 | — | 353,714 |
| Intersegment revenue | 1,253 | 3,099 | — | 938 | 792 | 6,082 | (6,082) | — |
| Total | 5,955 | 334,317 | 3,341 | 14,023 | 2,160 | 359,796 | (6,082) | 353,714 |
| Segment profit or loss (Note 1) | (10,643) | 129,255 | 1,556 | (6,217) | (5,311) | 108,640 | (1) | 108,639 |
| Other income (expense), net | — | — | — | — | — | — | — | (4,943) |
| Operating income | — | — | — | — | — | — | — | 103,696 |
| Finance income (costs), net (Note 5) | — | — | — | — | — | — | — | 52,431 |
| Loss on revaluation (Note 7) | — | — | — | — | — | — | — | (5,356) |
| Share of loss of investments accounted for using equity method | — | — | — | — | — | — | — | (10,246) |
| Income before income taxes | — | — | — | — | — | — | — | 140,525 |
| (Other items) | | | | | | | | |
| Depreciation and amortization (Note 6) | 1 | 5,477 | 123 | 330 | 836 | 6,767 | — | 6,767 |
| Impairment loss | 42 | 2,787 | — | 329 | 2,179 | 5,337 | — | 5,337 |
| Capital expenditures (Note 3) | 9 | 14,521 | 114 | 630 | 854 | 16,128 | — | 16,128 |

(Notes) 1. Segment profit or loss is calculated by deducting cost of sales and selling, general and administrative expenses from revenue.

2. Price for intersegment transactions is based on the general market price.

3. Capital expenditures include investments in property, plant and equipment, right-of-use assets and intangible assets. However, investment in crypto-assets made through an exchange is excluded from the investment in intangible assets.

4. Adjustments in segment profit or loss of ¥(1) million represent elimination of intersegment transactions.

5. Major components of finance income are foreign exchange gain of ¥41,708 million and gain on sale of investments accounted for using equity method of ¥9,531 million in connection with the transfer of shares of Six Waves Inc.
The gain on the sale occurred due to the transfer of all shares of Six Waves Inc. owned by Nexon to Stillfront Group AB (publ) during the three months ended March 31, 2022. Consequently, Six Waves Inc. was excluded from the scope of the application of equity method for the three months ended March 31, 2022.

6. In addition to property, plant and equipment and intangible assets, depreciation arising from right-of-use assets is included.

7. Loss on revaluation recognized in profit or loss due to the revaluation of an intangible asset (investment in crypto-assets made through an exchange).

8. For PC online and mobile, performance obligations are fulfilled and revenues are recognized over a certain period of time mainly because control over services is transferred over a certain period of time.

EXHIBIT D
140

(3)     Revenue from major products and services

Revenue from major products and services are as follows:

(Millions of yen)

|  | Fiscal year ended December 31, 2021 | Fiscal year ended December 31, 2022 |
|---|---|---|
| Item charging | 190,345 | 253,415 |
| Royalty | 79,285 | 95,279 |
| Other | 4,832 | 5,020 |
| Total | 274,462 | 353,714 |

(4)     Information by region

Carrying amounts of non-current assets (excluding financial assets, deferred tax assets and investment in crypto-assets) are as follows:

(Millions of yen)

|  | As of December 31, 2021 | As of December 31, 2022 |
|---|---|---|
| Japan | 5 | 2 |
| Korea | 50,014 | 62,745 |
| China | 205 | 227 |
| North America | 1,175 | 1,001 |
| Other | 32,302 | 29,828 |
| Total | 83,701 | 93,803 |

(Notes) 1. Non-current assets are classified into country or region category based on the location.

2. Categorization by country or region is based on geographic proximity.

3. Major countries or regions contained in each regional category:

(1) North America: USA

(2) Other: Europe and Asian countries

EXHIBIT D
141

Revenue from external customers are as follows:

For the fiscal year ended December 31, 2021 (From January 1, 2021 to December 31, 2021)

(Millions of yen)

| | Revenue by major business | | | Total |
|---|---|---|---|---|
| | PC online | Mobile | Other | |
| Main regional market | | | | |
| Japan | 3,291 | 7,152 | 26 | 10,469 |
| Korea | 102,934 | 50,270 | 1,479 | 154,683 |
| China | 73,006 | 589 | — | 73,595 |
| North America and Europe | 5,463 | 13,108 | 97 | 18,668 |
| Rest of World | 10,005 | 6,959 | 83 | 17,047 |
| Total | 194,699 | 78,078 | 1,685 | 274,462 |

(Notes) 1. Revenue is broken down by country or region based on customer location.

2. Categorization by country or region is based on geographic proximity.

3. Major countries or regions contained in each regional category:

(1) North America and Europe: USA, Canada and Europe

(2) Rest of World: Central and South America and Asian countries

For the fiscal year ended December 31, 2022 (From January 1, 2022 to December 31, 2022)

(Millions of yen)

| | Revenue by major business | | | Total |
|---|---|---|---|---|
| | PC online | Mobile | Other | |
| Main regional market | | | | |
| Japan | 3,592 | 6,916 | 15 | 10,523 |
| Korea | 134,087 | 77,249 | 1,564 | 212,900 |
| China | 85,787 | 593 | 11 | 86,391 |
| North America and Europe | 6,469 | 13,570 | 12 | 20,051 |
| Rest of World | 12,295 | 11,474 | 80 | 23,849 |
| Total | 242,230 | 109,802 | 1,682 | 353,714 |

(Notes) 1. Revenue is broken down by country or region based on customer location.

2. Categorization by country or region is based on geographic proximity.

3. Major countries or regions contained in each regional category:

(1) North America and Europe: USA, Canada and Europe

(2) Rest of World: Central and South America and Asian countries

(5)   Information on major customers

One customer contributed more than 10% of Nexon Group's consolidated revenue for the fiscal years ended December 31, 2021 and 2022, and revenue earned from the customer were ¥63,743 million (Korea segment) and ¥75,070 million (Korea segment), respectively.

EXHIBIT D
142

(Per Share Information)

Basic and diluted earnings per share attributable to owners of the parent company are calculated based on the following information.

(Millions of yen)

|  | Fiscal year ended December 31, 2021 | Fiscal year ended December 31, 2022 |
|---|---|---|
| Net income attributable to owners of the parent company | 114,888 | 100,339 |
| Adjustments of net income used for the calculation of diluted earnings per share | | |
| Adjustments due to dilutive shares of consolidated subsidiaries | (647) | — |
| Diluted net income attributable to owners of the parent company | 114,241 | 100,339 |
| Number of basic weighted-average common stock (Note 1) | 891,231,822  shares | 874,516,449  shares |
| Dilution: Stock option | 11,486,933  shares | 7,093,751  shares |
| Number of dilutive weighted-average common stock | 902,718,755  shares | 881,610,200  shares |
| Earnings per share (attributable to owners of the parent company) | | (Yen) |
| Basic earnings per share | 128.91 | 114.74 |
| Diluted earnings per share (Note 2) | 126.55 | 113.81 |

(Notes) 1. Nexon's common stock held by our consolidated subsidiary, Stiftelsen Embark Incentive is included in the treasury stock deducted in the calculation of the number of basic weighted-average shares of common stock. As for the deducted treasury stock, the average number of shares during the period was 336,017 shares for the fiscal year ended December 31, 2021 and 847,598 shares for the fiscal year ended December 31, 2022.

2. Some of the subscription rights to shares issued by Nexon do not have any dilutive effect and thus are not included in the calculation of diluted earnings per share.

(Significant Subsequent Event)

Acquisition of trust beneficiary certificates

On January 10, 2023, Nexon Group acquired the trust beneficiary certificates for a real estate based on a resolution of our Board of Directors meeting on December 13, 2022.

(a) Details of the real estate pertaining to the trust beneficiary certificates

| Name of building | Autoway Tower |
|---|---|
| Location | 948 Daechi-dong, Gangnam-gu, Seoul, Korea |
| Land area | 8,267.10m² |
| Total floor area | 47,721.19m² (9 stories above ground and 5 stories underground) |

(b) Reason for and details of the acquisition

In order to secure office space in Gangnam-gu, Seoul, our consolidated subsidiary, NEXON Korea Corporation acquired 50% of the trust beneficiary certificates from The Korean Teachers' Credit Union at KRW 190,585 million (about ¥20,107 million). As a priority right to lease, etc. is included in the trust beneficiary certificates, NEXON Korea Corporation and its affiliates can rent the building pertaining to the trust beneficiary certificates on a preferential basis in accordance with predefined conditions. These trust beneficiary certificates will be accounted for using the equity method.

EXHIBIT D
143

# EXHIBIT E





# EXHIBIT F

1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| WOLFIRE GAMES, LLC, SEAN COLVIN, SUSANN DAVIS, DANIEL ESCOBAR, WILLIAM HERBERT, RYAN LALLY, HOPE MARCHIONDA, EVERETT STEPHENS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>VALVE CORPORATION,<br><br>        Defendant. | Case No. _____<br><br>**[PROPOSED] ORDER GRANTING MOTION TO QUASH SUBPOENA TO NON-PARTY NEXON AMERICA INC.** |

The Court, having considered third-party Nexon America Inc.'s motion to quash the he subpoena (the "Subpoena") served by Valve Corporation ("Valve"), hereby quashes the Subpoena.

The Court further Orders that based on Valve Corporation's failure to comply with Fed. R. Civ. P. 45 (d)(1), Nexon America Inc. is directed to file a declaration establishing the costs and fees it incurred in bringing its motion within ten (10) days of this Order.

Date: _____, 2023

_____
UNITED STATES DISTRICT JUDGE

[Proposed] Order Granting Motion To Quash
Subpoena To Non-Party Nexon America Inc.
EXHIBIT F
148

## **CERTIFICATE OF SERVICE**

1.     I am employed with the law firm of Smith ♦ Ellison, whose address is 2151 Michelson Drive, Suite 185, Irvine, California 92612; I am not a party to the cause; I am over the age of eighteen years.

2.     I hereby certify that on this 21st day of February 2023, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO QUASH SUBPOENA TO NON-PARTY NEXON AMERICA INC.**

3.     Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  On this 21st day of February 2023, I caused for collection and processing of correspondence for mailing with the United States Postal Service and know that in the ordinary course of Smith ♦ Ellison's business practice the document described above will be deposited with the United States Postal Service on the same date that it is placed at Smith ♦ Ellison with postage thereon fully prepaid for collection and mailing on any of the following non-CM/ECF participants:

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 21st day of February 2023, at Irvine, California.

/S/   Kathleen Higuera
                    Kathleen Higuera

motion to quash.mem.docx

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| Alicia Cobb, WSBA #48685<br>QUINN EMANUEL URQUHART<br>& SULLIVAN, LLP<br>1109 First Avenue, Suite 210<br>Seattle, Washington 98101<br>aliciacobb@quinnemanuel.com<br><br>Steig D. Olson (*pro hac vice*)<br>David LeRay (*pro hac vice*)<br>Nic V. Siebert (*pro hac vice*)<br>QUINN EMANUEL URQUHART<br>& SULLIVAN, LLP<br>51 Madison Avenue<br>New York, New York 10010<br>steigolson@quinnemanuel.com<br><br>Adam Wolfson (*pro hac vice*)<br>QUINN EMANUEL URQUHART<br>& SULLIVAN, LLP<br>865 S. Figueroa St., 10th Floor<br>Los Angeles, California 90017<br>adamwolfson@quinnemanuel.com<br><br>Charles Stevens (*pro hac vice*)<br>QUINN EMANUEL URQUHART<br>& SULLIVAN, LLP<br>50 California St., 22nd Floor<br>San Francisco, CA 94111<br>charliestevens@quinnemanuel.com | Stephanie L. Jensen, WSBA #42042<br>Tyre L. Tindall, WSBA #56357<br>WILSON SONSINI GOODRICH &<br>ROSATI P.C.<br>701 Fifth Avenue, Suite 5100<br>Seattle, WA 98104-7036<br>sjensen@wsgr.com<br>ttindall@wsgr.com<br><br>Kenneth R. O'Rourke (*pro hac vice*)<br>Scott A. Sher (*pro hac vice*)<br>Allison B. Smith (*pro hac vice*)<br>WILSON SONSINI GOODRICH &<br>ROSATI, P.C.<br>1700 K Street, NW, Suite 500<br>Washington, DC 20006<br>korourke@wsgr.com<br>ssher@wsgr.com<br>allison.smith@wsgr.com<br><br>W. Joseph Bruckner (*pro hac vice*)<br>Joseph C. Bourne (*pro hac vice*)<br>Leona Bridget Ajavon (*pro hac vice*)<br>Kyle J. Pozan (*pro hac vice*)<br>LOCKRIDGE GRINDAL NAUEN P.L.L.P.<br>100 Washington Avenue S, Suite 2200<br>Minneapolis, MN 55401<br>wjbruckner@locklaw.com<br>jcbourne@locklaw.com<br>*Interim Co-Lead Counsel* |

David Golden (*pro hac vice*)
Justin Fore (*pro hac vice)*
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., 22nd
Floor
Washington, D.C. 20004
dgolden@constantinecannon.com

A. Owen Glist (*pro hac vice*)
Ankur Kapoor (*pro hac vice*)
Jeffrey I. Shinder (*pro hac vice*)
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
oglist@constantinecannon.com

Kenneth J. Rubin (*pro hac vice*)
Timothy B. McGranor (*pro hac
vice*)
Kara M. Mundy (*pro hac vice*)
Douglas R. Matthews, (*pro hac
vice*)
VORYS, SATER, SEYMOUR
AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com

Thomas N. McCormick (*pro hac
vice*)
VORYS, SATER, SEYMOUR
AND PEASE LLP
4675 MacArthur Court, Suite 700
Newport Beach, California 92660
tnmccormick@vorys.com

Gavin W. Skok, WSBA #29766
FOX ROTHSCHILD LLP
1001 Fourth Avenue, Suite 4400
Seattle, WA 98154
gskok@foxrothschild.com

Kristen Ward Broz
FOX ROTHSCHILD LLP
2020 K. St. NW, Ste. 500
Washington, DC 20006
kbroz@foxrothschild.com

Nathan M. Buchter
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
nbuchter@foxrothschild.com

Charles B. Casper (*pro hac vice*)
Peter Breslauer (*pro hac vice*)
Robert E. Day (*pro hac vice*)
Jessica Rizzo (*pro hac vice*)
MONTGOMERY McCRACKEN
WALKER
& RHOADS LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103
ccasper@mmwr.com
pbreslauer@mmwr.com
rday@mmwr.com
jrizzo@mmwr.com